## ALSIDE, INC. v. GENE A. LARSON AND ANOTHER.

220 N. W. 2d 274.

June 21, 1974—No. 44734.

*Faegre & Benson, Rodger L. Nordbye,* and *J. W. Snider,* for appellants.

*Feinberg, Meyers, Schumacher & Schumacher* and *James J. Schumacher,* for respondent.

Heard before Peterson, Kelly, and Knutson, JJ., and considered and decided by the court.

KNUTSON, JUSTICE.*

This is an appeal from an order of the District Court of Hennepin County denying defendants' post-trial motion for amended findings and granting to plaintiff an injunction to restrain defendants from violating a restrictive covenant executed by defendant Gene A. Larson as part of an employment contract.

Plaintiff, Alside, Inc., is a wholly owned subsidiary of United States Steel Corporation and manufactures aluminum and steel siding and related products at its corporate headquarters in Akron, Ohio. Such products are distributed in a five-state area consisting of Minnesota, North Dakota, South Dakota, Iowa, and Wisconsin, through the plaintiff's wholly-owned subsidiary, Alside Supply Company of Minneapolis.

Defendant Larson has been in the building trade and siding industry for more than 13 years. From 1959 to 1962, he was employed by National Gypsum Company in Minneapolis and St. Cloud, selling a full line of gypsum and asbestos siding materials. In 1962 he was employed in the Minneapolis office of

---

* Retired Chief Justice acting pursuant to Minn. St. 2.724.

the Century Building Supply Company. From 1963 to 1965, he managed Century's operation in Fargo, North Dakota. Thereafter, until April 1967, he worked for United States Gypsum Company in Rochester, Minnesota. Acting as a roofing and siding specialist for United States Gypsum, Larson basically covered the states of South Dakota, Minnesota, and Wisconsin, but admitted that he did not cover the counties of Hennepin, Ramsey, Anoka, Washington, Scott, or Dakota. While he dealt with a wide variety of siding materials before going to work for Alside, he testified that he never sold aluminum siding in the six-county Twin City area until he joined Alside, Inc.

Late in April or early in May 1967, Larson met with Irwin E. Hahn, executive sales supervisor of Alside Supply Company, in Minneapolis. Hahn arranged an interview with William J. Sauer, vice president in charge of sales for Alside, Inc. On May 8, 1967, Larson met with Hahn and Sauer at the Sheraton-Ritz Hotel in Minneapolis and filled out an application for employment with plaintiff in Minneapolis. On or about May 29, 1967, he met with Sauer in Akron, where he executed the restrictive covenant plaintiff seeks to enforce.

The testimony as to what occurred at the interview with Hahn and Sauer at the Minneapolis Sheraton-Ritz Hotel is somewhat unclear. Hahn testified that it was his belief that he and Sauer that night orally set out the contract terms, including the terms of a restrictive covenant, and that Larson orally accepted the terms of such agreement as they left the hotel. Hahn also testified that subsequent to Larson's acceptance of the contract terms, Larson went to Akron for indoctrination and training. Larson testified that Hahn and Sauer offered him a job and talked about his proposed salary and other compensation, but Larson did not mention whether he accepted the offer that night or whether the restrictive covenant was discussed or accepted on that occasion. Larson also testified that he filled out an employment application in Minnesota, but was uncertain as to whether he submitted the application to Hahn in Minnesota or

to Sauer in Ohio. Larson admitted that he then traveled to Alside's home office in Akron, Ohio, and signed a restrictive covenant and filled out social security and wage withholding forms. Sauer testified that he believed he communicated to Larson, in accordance with standard operating procedure, all the terms of employment, including the terms of the restrictive covenant, and declared that "if [Larson] met all the qualifications and if Mr. Hahn was satisfied, he looked okay to [him]." In his memorandum, the trial judge concluded that Larson accepted employment in Minnesota and that the signing of the covenant in Ohio was "merely perfunctory."

The restrictive covenant, which is the source of this litigation, reads as follows:

### "AGREEMENT

"The undersigned, Gene A. Larson * * *, hereinafter called the Employee, in consideration of Alside, Inc. and All & Any of Its Subsidiaries * * *, hereinafter called the Employer, extending employment to the Employee, hereby recognizes and acknowledges that during the period of such employment Employee will acquire or come into possession of trade secrets, customer lists, and other confidential information all of which are special and vital to the conduct of Employer's business, and Employee recognizes that employment by him for any competitor of Employer will necessarily involve the improper use or disclosure of such confidential information, to the great and irreparable detriment of Employer; and in recognition thereof, Employee agrees:

"1. That, during his employment and for the period of two (2) years from the date of the termination of his employment for any reason whatsoever, either by himself or by the Employer, he shall not, either directly or indirectly, on his own account or in the service of others, engage in the manufacture, sale, distribution or promotion of the sale of aluminum siding and such other products manufactured or sold by the Employer, or other competing products of said Employer, in any area or territory in

which the Employee shall have been located, employed, or worked for said Employer during his employment;

"2. That, during the term of his employment or at any time thereafter, he will not furnish to any individual, firm or corporation other than the Employer, any list or lists of customers, trade secrets, business policies or any other confidential and secret information pertaining to the Employer's business;

"3. That, should he violate any part of this agreement, the Employer shall be entitled to all legal relief including injunctive relief enjoining or restraining the Employee and each and every person concerned therein from the continuance of such violation, employment, service or other act in contravention of this agreement or in aid of the business of such other competitive company, concern or individual.

"IN WITNESS WHEREOF, I have hereunto set my hand at Akron, Ohio, this Thirty-first day of May, 1967.

"/s/ Gene A. Larson"

The restrictive covenant on its face applied to all of the Alside territory in which Larson was active, but at the close of the trial Alside requested that Larson be restrained pursuant to the terms of this covenant only in the counties of Hennepin, Ramsey, Anoka, Dakota, Washington, and Scott. It is to be gathered from the record that these were the counties where Larson had not been active before working for Alside.

Larson was employed by plaintiff as a warehouse manager in Minneapolis as of May 31, 1967. In that capacity he also made sales of plaintiff's products in Minnesota, western Wisconsin, North and South Dakota, and Iowa. As warehouse manager, he became acquainted with and had access to customer reference lists, prospects lists, monthly customer purchase records, sales commission reports, sales analysis reports, promotional contest sales reports, specialty sales contest commission reports, accounts receivable listings, sales and inventory reports, and trade inquiry reports, all of which were confidential business records maintained by Alside in its Minneapolis office. Larson admitted

at trial on cross-examination that most of this information was confidential and invaluable to Alside and that Alside did not want such information to "get into a competitor's hands." Of the many names appearing on the customer reference lists to which Larson had access in 1972, only 43 percent appeared in published directories and other public sources.

In addition to having access to these records, Larson was taught the sales methods and promotional scheme and program used in the distribution of Alside's products; familiarized with a trip incentive program; and was a host for various promotional trips to Hawaii, Rome, and Jamaica, offered by Alside to its customers and their wives as incentive for reaching certain quotas in the sale of its products.

In February 1973, Larson made contact with Bruce Hoyt, president of defendant Independent Distributing and Manufacturing, Inc. (hereinafter IDM). Hoyt and Larson met again in March and Larson's employment with IDM was discussed. IDM was formed in 1972 as a new venture into the wholesale distribution of aluminum building materials to compete with Alside. Prior to its employment of Larson, IDM had no offices of its own or employees in this business. It had no significant sales volume and was attempting to break into the market in which Alside was already engaged. In discussing employment with IDM, Larson was concerned about the restrictive covenant contained in his employment contract with Alside. He told Hoyt about it and eventually furnished him with a copy of the restrictive covenant. Hoyt informed Larson that he was of the opinion that the contract was not valid. After conferring with legal counsel, Hoyt told Larson that counsel was of the opinion that a company as large as Alside would not attempt to enforce such a covenant, which the attorney felt was unreasonably restrictive. Hoyt also assured Larson that if he had trouble with Alside as a result of it, he, Hoyt, would provide Larson with legal and moral support.

Hoyt considered Larson a unique and valuable employee and

was of the opinion that he would be a definite asset to the new IDM company due to his experience in this field. He wished to relieve Larson's concern about his contract with Alside so that he would come to work for IDM. Hoyt eventually made a written proposal to Larson setting out the terms of his proposed employment contract. Larson thereupon resigned his employment with Alside on April 2, 1973, and immediately commenced employment with IDM. On April 6, 1973, Alside, through a letter from Sauer, pointed out some of the restrictive portions of the contract that Alside had with Larson and informed Larson that Alside was not waiving any rights thereunder.

On April 13, 1973, Larson sent out a letter or brochure containing his picture and indicating he was doing business at a new location, soliciting sales of aluminum and vinyl siding products for IDM. This letter went to approximately 250 dealers, architects, and contractors taken from a prospect list maintained by Bruce Hoyt. Eighty to ninety percent of those to whom this letter was sent were Alside customers at the time. Larson testified that he helped select the 250 names from Hoyt's mailing list of 1,300 names and that he added 24 names of current Alside customers to the list. Larson also commenced making personal calls on Alside customers and within a period of less than 3 months had called on 75 to 80 Alside customers. Larson admits that he attempted by this mailing to transfer goodwill which he had built up for himself while working for Alside over to IDM.[1]

---

[1] The following is indicative of Larson's testimony on cross-examination:

"Q. Were you attempting, by that letter, Mr. Larson, to transfer the goodwill that you had built up for yourself while working with Alside, over to Independent Distributing and Manufacturing?

"A. Yes, I want all the business I can get.

"Q. And you wanted to transfer the goodwill you had built up for yourself at Alside over there, by stating that you were at a new location?

"A. From Alside?

"Q. Yes.

While employed by IDM, Larson also disclosed to Hoyt certain business practices followed by Alside pertaining to pricing, rebates, and "stocking accounts." On September 19, 1973, the trial court granted injunctive relief to Alside and issued its findings of fact, conclusions of law, and order for judgment. The order, as subsequently amended, enjoined Larson from the sale of aluminum siding products to certain of Alside's customers in Hennepin, Ramsey, Anoka, Dakota, Washington, and Scott Counties for a period of 2 years. The amended order also permanently enjoined defendants from using or disclosing confidential information about Alside's business practices, including pricing policies, the handling of "stocking accounts," discount and rebate policies, and credit policies and credit information. The trial judge in granting injunctive relief declared that the restrictive covenant "was for a just and honest purpose, * * * was reasonable and fair as between the parties, and was not and is not injurious to the public." The trial judge further concluded that "unless defendants are restrained as requested, plaintiff will suffer irreparable injury in that it will lose customers for which it would be most difficult, if not impossible, to prove damages."

In their brief, defendants devote much of their attention to establishing that Ohio law governs the enforceability of this restrictive covenant and that under Ohio law the contract is unenforceable.

The trial court was of the opinion that the employment contract was actually made in Minnesota and that only the perfunc-

---

"A. I've been in the business 14 years and I have built up my goodwill before I was with Alside.

"Q. I'll ask you the question again, Mr. Larson. Did you hope and intend and plan to transfer the Alside—or the goodwill that you had built up for yourself at Alside over to Independent Distributing and Manufacturing, by stating that you were at a new location?

"A. I believe you would be right, yes.

"Q. You did try that?

"A. I'm hired to get business, yes; I was trying to get business."

tory act of signing the restrictive covenant remained to be done in Ohio.

We do not think it is necessary to spend a great deal of time on a discussion of which law applies for we are convinced that Ohio follows substantially the same rules of law as we do in the enforcement of a restrictive covenant of this kind. So, actually, there is no conflict of laws question involved.[2] Even if we were to hold that Ohio law differs from our law concerning the enforceability of such covenants, we think the trial court's determination that our law should govern is amply sustained by the evidence in that the contract was for all essential purposes made in Minnesota. Defendants conceded on oral argument that one of the significant criteria in determining which law applies is the intention of the parties. Defendants rely in part on Combined Ins. Co. of America v. Bode, 247 Minn. 458, 77 N. W. 2d 533 (1956). That case is clearly distinguishable from this one in that there the parties on both sides of the contract agreed that the law of Illinois should govern. Here, there is no such agreement, and there is no evidence in the record to show what the intention of the parties was. However, it strains credulity, assuming the restrictive covenant was, as defendants contend, unenforceable under the law of Ohio, that the parties would have intended a law to apply that would void the very contract they were signing. On oral argument, counsel for defendants stated that Larson did not know what the law of the two states was at the time he signed this contract, but the record is clear that he understood what he was signing and that when he accepted employment with IDM he was greatly concerned about the restriction contained in this covenant. We think it is amply sustained by the evidence that, regardless of what the law of Ohio is, the parties intended the contract to be enforceable and that that law should apply which would make this possible. See, Larx Co. Inc. v. Nicol, 224 Minn. 1, 10, 28 N. W. 2d 705, 710 (1946), where we said:

---

[2] See, Leflar, American Conflicts Law, § 103, p. 239; cf. Milkovich v. Saari, 295 Minn. 155, 203 N. W. 2d 408 (1973).

"* * * Where the place of performance covers several states or countries, the courts generally have held, in the absence of evidence to the contrary, that the parties to a contract have intended that the law of the place of contracting should govern as to questions of validity and legal effect."

The latest expression of the law by the Supreme Court of Ohio is found in Extine v. Williamson Midwest, Inc. 176 Ohio St. 403, 200 N. E. 2d 297 (1964), where the court upheld part of an agreement quite similar to the one involved here. The Extine case has been followed in lower courts in Ohio. In Clooney v. WCPO, 35 Ohio App. 2d 124, 126, 300 N. E. 2d 256, 258 (1973), the Court of Appeals of Ohio quoted from Briggs v. Butler, 140 Ohio St. 499, 45 N. E. 2d 757 (1942), the following:

"A contract between an employer and employee whereby the latter agrees that subsequent to the termination of such employment he will not engage in a competitive business within a reasonably limited time and space is valid and enforceable where the restraint is not beyond that reasonably necessary for the protection of the employer's business, is not unreasonably restrictive upon the rights of the employee and does not contravene public policy."

The court in Clooney quotes the following from the Extine case:

"An agreement in restraint of trade may be divisible, that is, subject to the application of the doctrine of partial validity, in which event any unreasonable limitation or restriction may be stricken from the contract, leaving the remainder thereof binding upon the parties." 35 Ohio App. 2d 127, 300 N. E. 2d 258.

Therefore, while it may not be of importance here, the later statement from Extine, known as the "blue pencil doctrine," permits a court to strike from such a contract those provisions which may be unenforceable.

Again, in the case of Patterson International Corp. v. Herrin, 25 Ohio Misc. 79, 264 N. E. 2d 361 (1970), the Extine case, as

well as Briggs v. Butler, *supra,* were cited in support of the court's decision upholding a restrictive covenant.

The law in Minnesota is probably as well stated in Bennett v. Storz Broadcasting Co. 270 Minn. 525, 134 N. W. 2d 892 (1965), and Eutectic Welding Alloys Corp. v. West, 281 Minn. 13, 160 N. W. 2d 566 (1968), as anywhere. In the Bennett case, we said:

"* * * The test applied is whether or not the restraint is necessary for the protection of the business or good will of the employer, and if so, whether the stipulation has imposed upon the employee any greater restraint than is reasonably necessary to protect the employer's business, regard being had to the nature and character of the employment, the time for which the restriction is imposed, and the territorial extent of the locality to which the prohibition extends.

"Restrictions which are broader than necessary to protect the employer's legitimate interest are generally held to be invalid, and the determination of the necessity for the restriction is dependent upon the nature and extent of the business, the nature and extent of the service of the employee, and other pertinent conditions." 270 Minn. 534, 134 N. W. 2d 892.

In the above case, we cite with approval Arthur Murray Dance Studios v. Witter, 62 Ohio L. Abs. 17, 105 N. E. 2d 685 (1952), and Briggs v. Butler, *supra.* We think the citation of these cases is indicative of the fact that Minnesota follows the same law as Ohio.

We recently had occasion to consider generally the enforceability of restrictive covenants in employment contracts in Walker Employment Service, Inc. v. Parkhurst, 300 Minn. 264, 219 N. W. 2d 437 (1974). We see no need of repeating what we said there. Under that and the previous decisions reviewed in it, we think the restrictive covenant involved in the case now before us is clearly enforceable, at least to the extent of the injunction issued by the court.

Applying these rules of law to the trial court's findings of fact, it is apparent that the evidence amply sustains the court's find-

ings. Larson was not only trained in the business operations of Alside but had a unique and intimate relationship with its customers throughout a number of years. He had access to much confidential information and admitted that he tried to transfer the goodwill that he had built up while working for Alside to IDM. If a restrictive covenant of this kind is ever enforceable, it is hard to imagine a case where an employer is more entitled to relief than in this case. At the request of Alside, the injunction was limited to the metropolitan counties, where Larson had not operated before coming to Alside, although the injunction could probably have been granted on a much broader basis. We think that where the court at the request of plaintiff has limited the restraint to such a small area it can hardly be held that the restraint is not reasonable as to the area affected. The time limitation is also reasonable and we agree with the trial court that there is no injury to the public interest. It would seem quite clear that a reasonable balance has been struck between protecting the business of the employer and not unreasonably limiting the rights of the employee. We think both Minnesota and Ohio follow the rule of reasonableness[3] in balancing the rights of the employer and employee in a contract of this kind and that here the evidence amply sustains the findings and order of the trial court.

Affirmed.