**MEDTRONIC, INC., a Minnesota corporation, Plaintiff,**

v.

**S. Todd GIBBONS, an individual, Defendant.**

Civ. No. 4–81–603.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 15, 1981.

Robert F. Henson, Stuart T. Williams, Henson & Efron, P. A., Minneapolis, Minn., for plaintiff.

Charles A. Cox, Craig A. Goudy, Cox & Goudy, Minneapolis, Minn., for defendant.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on the plaintiff's motion for a preliminary injunction restraining the defendant from violating a restrictive covenant in an employment contract. The Court has jurisdiction over the subject matter of this action by virtue of 28 U.S.C. § 1332. Upon consideration of the verified complaint, the affidavits submitted by the parties, the depositions in the file, and the memoranda and arguments of counsel, and it appearing to the Court that the plaintiff has demonstrated a threat of irreparable injury and a strong likelihood of success on the merits, a preliminary injunction shall issue.

The plaintiff, Medtronic, is a Minnesota corporation engaged in the business of inventing, producing and marketing sophisticated medical electronic devices for implantation in human beings. One of the most important of these devices is the cardiac pacemaker, which is implanted in a patient to provide electrical impulses to stimulate heart activity. Medtronic markets its pacemakers worldwide. In the United States, it controls about 40 percent of the pacemaker market.

The defendant, S. Todd Gibbons, was first employed by Medtronic on August 20, 1974, to monitor clinical studies of new and existing products. Medtronic's written offer of employment with Gibbons stated: "This offer of employment is contingent upon the passing of our physical examination and executing the Company's Standard Employee Agreement on inventions, proprietary information and unfair competition." The standard Employee Agreement which Gibbons signed on August 20, 1974, included a clause which read: "For 360 days after my employment, I will not attempt to divert

any Company business by influencing customers with whom I or my subordinates were connected the last year of my employment." Gibbons received two weeks of training in general anatomy and product familiarization. In 1976, he was promoted to the position of manager of clinical engineering for the company's United States operations.

In September or October of 1977, Gibbons was told by his direct supervisor that his job was being terminated as of January 1, 1978, because of a corporate reorganization. Medtronic had an informal policy of encouraging its employees being terminated to seek other employment within the organization. It also had a system of posting job openings at various places in its facilities. In his search for a new job, Gibbons applied in November, 1977, for a position at Kastec Corp., which is a subsidiary of Medtronic. Gibbons obtained the position of technical services manager at Kastec. He commenced working at Kastec without any loss of work time between jobs. In his deposition, Gibbons characterized his work for Medtronic as "continuous." A Kastec employee information document indicates that Gibbons was considered to have a "change" in jobs within the Medtronic family rather than being a "new hire." His new position at Kastec paid less than the job he left at Medtronic. The insurance coverage Gibbons had at Medtronic remained in effect when he went to work at Kastec. As was true of his prior employment for Medtronic, Gibbons worked for Kastec in Minnesota.

The facts are unclear regarding when Gibbons actually commenced work for Kastec. A Kastec document lists the effective date of his salary as January 2, 1978. A second document indicates that Gibbons received an office key and a telephone credit card on January 3, 1978. On January 4, 1978, Gibbons signed and dated a letter setting forth Kastec's policy regarding equipment, keys and other property employees receive in connection with their employment at Kastec. He also received a Honeywell Security Number on that date. At some point in time, Gibbons signed but failed to date a new Employee Agreement.

This agreement contained a clause which reads:

5. Competitive Employment

. . . .

(b) For 360 days after termination of my employment with the Company, I will not attempt to divert any Company business by soliciting, contacting, or communicating with any customers for the Company's products with whom I, or employees under my supervision, had contact during the year preceding termination of my employment.

Paragraph 1(a) of the Agreement defines "Company" to mean "Medtronic, Inc. and all of its existing, past, or future parent, subsidiary, or affiliated corporations, and any divisions of them, to include Kastec Corporation." In addition, paragraph 6 of the Agreement provides: "This Agreement and any disputes arising under or in connection with it shall be governed by the laws of the State of Minnesota."

Gibbons contends that the evidence is hopelessly inconclusive as to the date when the document was signed. Medtronic alleges that Gibbons signed the Employee Agreement on the day he began working for Kastec, which it contends was on or about January 4, 1978. At his deposition, Gibbons said:

Q Am I correct when I say that—that you don't have any exact memory as to when you signed this [Employee Agreement], but based on the witnessing, it's your belief that it was some weeks after your employment began?

A Yes.

Q Now, when you read this, you read and knew of the presence in this agreement of paragraph 5b, did you not?

A Yes.

Q Did you seek any legal advice in connection with this agreement before signing it?

A No, I knew from experience and the experience of others that it was—you are expected to sign.

Q So the answer is that you did not seek any such advice; is that right?

A Yes.

Q But at the time you signed this, it was your state of mind, was it not, that you were contractually obligating yourself to the terms that are set forth in this [Employee Agreement]?

A Yes.

Gibbons First Deposition, p. 24. In 1978 Kastec had a standard operating procedure of requiring all employees to sign certain documents, including the Employee Agreement, when beginning employment with Kastec.[1]

While working for Kastec, Gibbons received a raise in annual salary from approximately $22,000 to approximately $27,000. In the fall of 1978, Gibbons saw a Medtronic job posting for a position of selling pacemakers in California. He applied for the job. The sales position had a lower grade level than his job at Kastec and a lower base salary. However, the job held a potential for earning additional commissions if a sufficient level of sales was reached. He was offered the job and accepted it in October, 1978. No new Employee Agreement was signed at this time.

Gibbons' sales territory consisted of parts of northern California and part of Nevada. Therefore, he moved to California in the fall of 1978. He performed well in the sales position. In 1979 he earned $53,038.74 in gross compensation. In 1980 he earned $109,718.87 in gross compensation.

Because of the manner in which cardiac pacemakers reach the ultimate consumer, the cardiac patient, Medtronic devotes substantial time to training and educating its sales representatives. Pacemakers are implanted in patients only upon the prescription of physicians, usually cardiologists, cardiac surgeons, and thoracic surgeons. Although the product is normally sold by manufacturers to the hospitals, which in turn sell them to patients, it is normally the prescribing physicians who determine the kinds of pacemakers that will be inventoried by the hospitals where they perform implantations. For this reason, the marketing activities of the manufacturers are principally directed at the prescribing physicians. The physicians are primarily interested in the reliability of the pacemakers they prescribe and in the services offered by the seller. These services included the counsel and advice of the sales representative regarding technical capabilities of the product. In addition, sales representatives are expected to be available to accompany the physician into the operating room for the purpose of testing the pacemaker, both before and after it is implanted, and to advise the physician on technical matters that may arise during surgery. Because physicians rely on the advice and skills of sales representatives, and because the pacemakers made by different manufacturers are often of equal quality, the confidence a physician has in the abilities of a sales representative frequently is an important factor in a physician's decision on which product to buy. For this reason, Medtronic provides its sales representatives with a number of courses in areas such as physiology and electrical engineering. It also provides sales representatives with extensive financial and other assistance to develop close business relationships with medical professionals responsible for selecting which pacemaker to buy. At the time Gibbons became a sales representative, he had already acquired substantial training from Medtronic from his prior positions with Medtronic and Kastec. After he became a sales representative, he received a one day course in sales plus annual national and regional meetings on product familiarization. Gibbons also improved his skills through experience on the job and self study.

In August, 1981, Gibbons began to discuss in earnest possible employment with Pacesetter Systems, Inc. On September 9, 1981, he resigned his position at Medtronic to go

---

1. Medtronic also had a policy of requiring all new employees to sign an Employee Agreement containing a restrictive covenant. In addition, when Medtronic modified its Employee Agreement between 1974 and 1978 to make it less restrictive for employees, it followed a policy of requiring all employees to execute the new Employee Agreement whenever the employee received a raise in salary, promotion, or other significant change in employment terms.

to work for Pacesetter. He informed his supervisor at Medtronic that he would be covering the same territory for Pacesetter as he covered for Medtronic. Gibbons soon began calling on his former Medtronic accounts on behalf of Pacesetter.

## APPLICABLE LAW

■ Although federal law governs the standards for issuing a preliminary injunction, state law provides the rules of decision on the merits of this diversity of citizenship action. In addition, a federal court must follow the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Therefore the Minnesota conflict of law rules govern here. The Minnesota Supreme Court established the general principles governing choice of law issues in contract cases in *Combined Insurance Co. of America v. Bode*, 247 Minn. 458, 77 N.W.2d 533 (1956).

Plaintiff and defendants, as well as the trial court, have proceeded on the theory that the law of Illinois governs in determining the issues involved in this case. We need go no further than to hold that the law of Illinois governs as to the proper construction of the contract. The place of making is where the last act necessary to give validity to the contract is performed. Here the last act to be performed under the express terms of the contract was the signing of the contract by plaintiff in Chicago, Illinois.

We are also committed to the rule that the parties, acting in good faith and without an intent to evade the law, may agree that the law of either state shall govern. Here the parties expressly agreed that the law of Illinois should govern.

77 N.W.2d at 536 (footnotes omitted). Here the Employee Agreement that Gibbons signed when working for Kastec was executed in Minnesota at a time when both parties were residents of Minnesota. For approximately ten months the defendant performed under the contract in Minnesota. He then moved to California, where he performed under the contract for nearly three years. The contract states that Minnesota law shall apply. All indications point to a conclusion that at the time the parties entered into this contract they intended to have Minnesota law apply. *See Minnesota Mining & Manufacturing Co. v. Kirkevold*, 87 F.R.D. 324, 331 (D.Minn.1980). The Court concludes that Minnesota law provides the rules of decision for this case.

## STANDARD FOR INJUNCTIVE RELIEF

In the Eighth Circuit, the test for determining whether a preliminary injunction should issue was set forth in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981). The Court stated that:

[W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

640 F.2d at 114. These elements will be considered seriatum.

### A. *Threat of Irreparable Harm*

Medtronic alleges that unless Gibbons is enjoined from contacting customers, it will suffer irreparable harm through the loss of goodwill of the business and by potential disclosure of confidential information. Gibbons contends that any injury Medtronic may sustain can be calculated with accuracy and compensated by money damages. He relies heavily on the deposition testimony of Dennis Dietz, the western regional manager of Medtronic. Dietz testified that it is possible to calculate a decline in sales over the course of a year after a sales representative departs, and if the sales representative goes to a competitor it would be possible to calculate the increase, if any, in the competitor's sales during the year.

■ The Minnesota Supreme Court has indicated in several cases that irreparable injury can result from a breach of a valid non-competition clause. In *Alside, Inc. v. Larson*, 300 Minn. 285, 220 N.W.2d 274 (1974), the defendant had worked in a sales

capacity for the plaintiff. His employment agreement included a restrictive covenant. He breached the restrictive covenant after leaving the plaintiff's employ, and the plaintiff sought injunctive relief. The trial court held that "unless defendants are restrained as requested, plaintiff will suffer irreparable injury in that it will lose customers for which it would be most difficult, if not impossible, to prove damages." 220 N.W.2d at 278. On appeal the Minnesota Supreme Court affirmed the trial court's ruling. In *Eutectic Welding Alloys Corp. v. West*, 281 Minn. 13, 160 N.W.2d 566 (1968), the Supreme Court indicated in dictum that an inference of irreparable harm can be drawn from the mere breach of a valid restrictive covenant. The Court stated:

Plaintiffs urged, with respect to this finding, that the court erred in failing to find irreparable harm as a necessary inference from proof that the convenants were breached and in failing to grant equitable relief against the threat of probable harm. That an inherent threat of irreparable injury may be inferred from the breach of an otherwise valid and enforceable restrictive covenant [sic] of this nature, sufficient to invoke at least temporary equitable relief, was, indeed, indicated in *Thermorama, Inc. v. Buckwold*, 267 Minn. 551, 125 N.W.2d 844. Our disposition of this case on the ground that the first covenant was not breached and that the second covenant, for other and more fundamental reasons, should not be enforced does not require a determination of such issue, except as we observe that the absence of provable injury may itself tend to show that the restrictive covenant is more broad than the legitimate interests of the employer may reasonably require.

160 N.W.2d at 569 n. 4. The Supreme Court later relied on this dictum in *Cherne Industrial, Inc. v. Grounds & Associates, Inc.*, 278 N.W.2d 81 (Minn.1979). In *Cherne Industrial*, the trial court had issued an injunction based on a restrictive covenant in an employment contract after a trial on the merits. On appeal, the Supreme Court noted that a party seeking an injunction must demonstrate the inadequacy of a legal remedy and the threat of irreparable injury. After citing *Thermorama, Inc. v. Buckwold* and quoting from footnote 4 of *Eutectic Welding*, the Supreme Court wrote:

Because a preliminary injunction is granted prior to a complete trial on the merits, a showing of irreparable harm is required to prevent undue hardship to the party against whom the injunction is issued, whose liability has not yet been determined. If irreparable harm can be inferred from an alleged breach for purposes of a temporary injunction, it can be inferred from a trial court's actual finding of a breach by the defendant. Moreover, where a trial court has determined that the prevailing party is entitled to relief, it may fashion such remedies, legal and equitable, as are necessary to effectuate such relief.

278 N.W.2d at 92. The Supreme Court then affirmed the issuance of the injunction. Taken together, these cases establish that under Minnesota law, a threat of irreparable harm can be inferred from the breach of a valid and unenforceable restrictive covenant.

██ The present case need not be based on this inference alone, for Medtronic has carried the burden of establishing the threat of irreparable harm. Due to the heavy reliance of implanting physicians on the skill and advice of pacemaker sales representatives, the sales representative naturally becomes closely identified with the manufacturer. A symbiotic relationship develops between sales representative and manufacturer. The skills of the sales representative enhance the reputation of the manufacturer, while at the same time the quality of the product and training provided by the manufacturer to the sales representative enhance the reputation and skills of the sales representative. Medtronic has a legitimate business interest in protecting the goodwill it provides for its sales representatives and in the goodwill created for it by its sales representatives during their employment. When a sales representative leaves its employ, Medtronic needs some

time to hire, train and place in the field a substitute sales representative. If the departing sales representative were to work for a competitor and immediately call on the same customers, Medtronic would be at an unfair competitive disadvantage. Some customers undoubtedly purchase the sales representative's new product, and may continue to purchase those products from him or her in the future. It would be difficult to calculate the sales Medtronic may lose in the course of a year, and extremely difficult or impossible to calculate all of the sales Medtronic may continue to lose in the future. "Irreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate." *Danielson v. Local 275, Laborers International Union of North America,* 479 F.2d 1033, 1037 (2d Cir. 1973); *see Miller Brewing Co. v. Carling O'Keefe Breweries of Canada, Ltd.,* 452 F.Supp. 429, 438 (W.D.N.Y.1978). Accordingly, Medtronic has carried its burden of establishing a threat of irreparable harm.

### B. *Likelihood of Success on the Merits*

■ This prong of the *Dataphase* test requires a preliminary evaluation of the merits of the case. This prong, however, is not a wooden test which requires a movant to prove a fifty percent or greater chance of success. Rather, the Court must evaluate the merits of the case in light of the equities of the other elements of the *Dataphase* test. 640 F.2d at 113. In this case Medtronic must show that there is a likelihood that the Employee Agreement is a valid contract and that the restrictive covenant is enforceable.

As to the validity of the Employee Agreement, Gibbons argues that it is invalid for lack of consideration. Gibbons' argument that there is no consideration has three parts. First, Gibbons argues that there is a hopeless conflict in the evidence as to whether the second Employee Agreement was signed before or after Gibbons started work for Kastec, and therefore obtaining the job at Kastec was not consideration. Second, Gibbons argues that if the Employee Agreement was signed after his employ-

ment with Kastec began, the continuation of employment cannot constitute consideration under Minnesota law. Third, Gibbons argues that the 1974 Employee Agreement expired when Gibbons left Medtronic to work for Kastec and therefore cannot bind Gibbons now. It is important to note that if Medtronic can establish a likelihood of success on any of these three points, it has met its burden on the issue of validity of the contract.

■ Although there is at this time no conclusive evidence regarding which day Gibbons started working for Kastec and which day he signed the Employee Agreement, the evidence does heavily preponderate in favor of finding that he signed the agreement on the first day of his employment. Gibbons argues that execution of the Employee Agreement was not a requirement for his obtaining employment with Kastec. However, Robert Nelson, the Kastec official who witnessed Gibbons' signature to the agreement, stated by affidavit that Kastec had at that time a policy that all new employees execute the Employee Agreement. For Gibbons to argue no such policy existed or that he did not know of it strains credibility. His original offer of employment with Medtronic in 1974 clearly stated that the offer was contingent upon signing an agreement containing a restrictive covenant before commencing work. The depositions, affidavits and arguments in this case clearly establish that all Medtronic employees knew that it was the policy of Medtronic and its subsidiaries to have employees sign new agreements upon beginning employment. Because of this strong policy, the question really is whether there is any evidence to indicate that Medtronic and Kastec deviated from its standard policy in this case.

The evidence shows that a Medtronic document indicates Gibbons' "Salary Effective Date" to be January 2, 1978. There is no indication whether Gibbons started work on that same day. Another Medtronic document shows that Gibbons received some Medtronic property such as a key on January 3, 1978. He received a security number

on January 4, 1978, and on the same day signed an agreement stating that it was a condition of employment that he treat these items of personal property solely for business purposes. It was standard procedure for this document to be presented to new employees along with the employment agreement on the first day of work. The logical conclusion from this is that Gibbons' first day of work was January 4, 1978, and that the employee agreement was also signed on that day.

Gibbons maintains that his copy of the Employee Agreement has a notation reading: "6–28–78 H.J." From this he concludes that there is strong evidence indicating that the agreement was signed at a later date and there is therefore a hopeless conflict in the facts. However, the copy that remains in Medtronic's file does not have this date and initials. Although the origin and meaning of the date and initials are unclear, it is doubtful that they have any relevance to the date of signing of the Employee Agreement. Medtronic's theory that the Employee Agreement was signed contemporaneously with the beginning of his employment is clearly more persuasive than Gibbons' theory that it was signed at a much later date.

Even if it was signed at a later date, the continued employment may constitute consideration for the Employee Agreement. The Minnesota Supreme Court dealt with this issue in *Davies & Davies Agency v. Davies*, 298 N.W.2d 127 (Minn.1980). In that case, two employees were required to sign restrictive covenants after commencement of their employment. The Supreme Court rejected rigid rules that continued employment either is or is not sufficient consideration. The Court said:

> The adequacy of consideration for a non-competition contract or clause in an on-going employment relationship should depend on the facts of each case. Mere

continuation of employment as consideration could be used to uphold coercive agreements. Yet, in cases such as these presently before the court, the agreement may be bargained for and provide the employee with real advantages.

298 N.W.2d at 130–31. One of the employees in *Davies* had signed an agreement four months after beginning his work for the employer. Nevertheless, it was held that there was consideration for the contract because he continued his employment for ten more years, advanced to a sales position that would not have been open if he had not signed, and received opportunities that another employee who had not signed did not receive. In the case of the second employee, the employment agreement was signed eleven days after his employment began. He had been made aware of the restrictive covenant's existence before accepting the employment offer, but had not had an opportunity to examine the language until he was required to sign or lose his job. This all or nothing proposition was tendered to him about a month after he had quit his former employment. Moreover, the employer failed to fulfill other critical terms of the employment agreement. In this situation, it was held that there was no consideration and the covenant was invalid.

 In the circumstances of this case, it seems likely that Medtronic will ultimately prevail on this ground. Employees at Medtronic and its subsidiaries who refuse to sign the Employee Agreement suffer the experience of being frozen in their jobs. Gibbons, however, received a raise in pay while working for Kastec. In addition, he obtained the sales position in California which likely would not have been available to him if he had not signed the Employee Agreement. This is sufficient to establish a strong likelihood of success on the issue of validity of the Employee Agreement.[2]

---

2. Because of the conclusion that Medtronic will likely prevail on the first two of Gibbons' three arguments on consideration, it is not necessary to deal with the third point in great detail. The third point involves the issue of whether the 1974 restrictive covenant is still valid. Gibbons relies upon the fact that when his position was to be terminated by Medtronic in 1977 because of a corporate reorganization, he was in a position of having to find a new job on his own. However, his supervisor testified that Medtronic had an informal policy of encouraging its

■ Even though the Employee Agreement does not appear to be vulnerable for lack of consideration, Medtronic must still establish that it is enforceable. Under Minnesota law, a restrictive covenant is unenforceable if the restraint is not necessary for the protection of the business or goodwill of the employer, or if the restraint imposed upon the employee is broader than necessary to protect the employer's legitimate business interest. *E.g., Walker Employment Service v. Parkhurst*, 300 Minn. 264, 219 N.W.2d 437, 441 (1974); *Bennett v. Storz Broadcasting Co.*, 270 Minn. 525, 134 N.W.2d 892, 899 (1965). As discussed earlier, Medtronic has established that it has a legitimate business interest in protecting its goodwill, and that a departing sales representative can transfer this goodwill to a new employer. The remaining issue, then, is whether the restrictive covenant is broader than necessary to protect Medtronic's goodwill.

■ Medtronic has drafted the restrictive covenant very narrowly. The terms limit the duration of restrictions on Gibbons' activities to the relatively short period of 360 days. Gibbons is not prohibited from following his occupation of selling pacemakers. Indeed, he may even continue selling pacemakers for a competitor of Medtronic in the same geographical area he served for Medtronic. Gibbons is only restrained by the terms of the restrictive covenant from contacting particular persons—i.e., the "customers" with whom he had contact in the year prior to the termination of his employment with Medtronic.[3] Medtronic's restrictive covenant protects its goodwill by prohibiting Gibbons from intruding on the area where the goodwill exists, in Medtronic's recent customers. It appears that the restrictive covenant is reasonable in both scope and duration and is therefore enforceable under Minnesota law.

### C. *Balance of the Harm*

■ This prong of the *Dataphase* test requires consideration of the harm that granting the preliminary injunction would cause to Gibbons, and comparing this harm to the potential harm to Medtronic. As noted earlier, the restrictive covenant is narrowly drawn. Enjoining Gibbons would not prevent him from working, even in the same territory he worked for Medtronic. It would only prevent him from contacting or communicating with a certain group of persons. In addition, Pacesetter has agreed to pay Gibbons a stipend of approximately $4,000 a month if he is enjoined from contacting his former Medtronic customers. This virtually guarantees that Gibbons will not suffer serious deprivation of income during the term of an injunction.

employees being terminated to seek other employment within the organization. The supervisor testified that of the five or so positions eliminated in 1977, only one did not find new employment within the Medtronic organization. Kastec's records indicate that Gibbons was considered a "change" in jobs, not a "new hire." The same record lists his starting date as August 20, 1974, rather than January of 1978. The insurance coverage Gibbons had at Medtronic remained in effect when he went to work at Kastec. Moreover, the 1974 Employee Agreement covers both Medtronic and its affiliates or subsidiaries. A conclusion that the 1974 agreement would still be effective would be supported by substantial evidence.

3. Gibbons argues that the meaning of the term "customer" is unclear and that the dispute over the meaning raises doubts about Medtronic's likelihood of success on the merits. However, Minnesota has adopted the "blue-pencil doctrine" which permits a court to enforce a restrictive covenant only to the extent that it is reasonable. *Bess v. Bothman*, 257 N.W.2d 791 (Minn.1977); *Davies & Davies Agency v. Davies*, 298 N.W.2d 127, 131 n. 1 (Minn.1980). Therefore if the term "customer" is unclear and overbroad, it is for the Court to interpret and, if necessary, narrow the meaning of the term.

When interpreting a contractual provision, the language will be construed most strongly against the drafter. The evidence in the file sheds light on the intended meaning of the term "customer." The ultimate consumer of pacemakers are cardiac patients, not hospitals or doctors. But the pacemakers are sold by the manufacturers to the hospital where the patient is being treated. The hospital purchases pacemakers on recommendations from a physician or other medical personnel treating a patient. Medtronic's sales effort focuses on the physicians and medical personnel. Thus, the term "customers" must include not only the hospital, which actually pays for the product, but also the physicians and surgeons who recommend which product to purchase.

Given the relatively minor harm to Gibbons, this prong weighs in favor of granting the motion for a preliminary injunction.

D. *Public Interest*

The final prong of the *Dataphase* test is the interest of the public. Gibbons argues that the public interest of making sure that all patients receive the best medical care available would be seriously hampered by restraining Gibbons. He would be limited in assisting doctors in implantations of pacemakers and from giving seminars to nurses and other hospital personnel. Although Gibbons does perform some beneficial public services by taking part in surgeries and giving seminars, he is primarily a salesman, not a doctor or an educator. His activities contribute to improving the quality of health care, but his temporary absence from a portion of his sales area would not seriously deteriorate the quality of health care in that area. In addition, Gibbons argues that restraining him may tend to reduce the competition for biomedical devices in his sales area. However, there is substantial competition in the pacemaker industry, and Pacesetter has only a minor portion of the market for pacemakers in northern California. Restraining Gibbons in the limited way available under the restrictive covenant would not seriously affect the competition in the industry. The public interest only slightly favors Gibbons, and is not nearly strong enough to prevent issuance of an injunction in view of the strength of the other three prongs of the *Dataphase* test.

The evidence presented thus far to the Court supports Medtronic's contention that the restrictive covenant in the Medtronic Employee Agreement is supported by sufficient consideration, was reasonable under the circumstances and is enforceable. It is undisputed that Gibbons breached the agreement by contacting his former customers on behalf of Pacesetters, and will continue to do so unless restrained by a Court order. Since Medtronic has established that it has a strong likelihood of prevailing at a trial on the merits and a threat of irreparable harm, it is entitled to a preliminary injunction which restrains Gibbons in accordance with the restrictive covenant contained in the Employee Agreement.

Accordingly, IT IS HEREBY ORDERED that the defendant S. Todd Gibbons is enjoined from violating the Employee Agreement which he entered into with Medtronic, Inc., by attempting to divert any business from Medtronic by soliciting, contacting, or communicating with any customers for Medtronic's products with whom the defendant had any contact during the year preceding September 8, 1981. The term customers shall be deemed to include hospitals, physicians, surgeons, or other hospital personnel directly involved in deciding which pacemaker to recommend for purchase. The term shall not include hospital personnel who are not directly involved in selecting which pacemaker to purchase. The defendant is further enjoined from assisting any other person in diverting business from or soliciting, contacting, or communicating with such customers of Medtronic, Inc.

IT IS FURTHER ORDERED that this preliminary injunction shall stay in effect until a decision is rendered after a trial on the merits or September 4, 1982, whichever occurs first.

IT IS FURTHER ORDERED that the parties shall confer on the question of whether a bond is necessary and, if so, in what amount. In the event of a disagreement, the defendant may apply to the Court for an order requiring a bond to be posted by the plaintiff.