**IDS FINANCIAL SERVICES, INC. and
IDS Life Insurance Company,
Plaintiffs,**

v.

**Steven F. SMITHSON, Defendant.**

No. 93 C 7850.

United States District Court,
N.D. Illinois, E.D.

Feb. 4, 1994.

Eric D. Brandfonbrener, Grippo & Elden, Chicago, IL, for plaintiffs.

Michael L. Flynn, Flynn Cosentino, Ltd., Lisle, IL, Michael J. O'Rourke, Thomas G. Griffin, Michael C. Moody, Kelly A. McCloskey, O'Rourke & Griffin, Chicago, IL, for defendant.

## OPINION AND ORDER

NORGLE, District Judge:

Before the court is the motion of plaintiffs IDS Financial Services, Inc. and IDS Life Insurance Company (collectively, "IDS") for a preliminary injunction. The motion is granted for reasons that follow.

### FACTS

Defendant Steven F. Smithson ("Smithson") resigned from his position as a personal financial planner representing IDS, a Delaware Corporation with its principal place of business in Minneapolis, Minnesota. Smithson's resignation from IDS's Lombard, Illinois office came after IDS confronted Smithson regarding evidence that Smithson had been copying IDS's confidential files and customer lists, soliciting business for himself from existing IDS customers, and diverting IDS's business. Smithson had also affiliated himself with an IDS competitor, SunAmerica Securities, Inc. ("SunAmerica"), while he was associated with IDS. After Smithson left IDS, he continued his investment, financial planning, and insurance practice through SunAmerica.

Smithson developed a financial planning business in the summer of 1990 and was certified as a financial planner in the summer of 1992. Nevertheless, Smithson had entered into a contractual affiliation with IDS to sell IDS products and services as an independent contractor through two agreements dated August 9, 1989. Smithson leased his office space and the majority of his equipment from IDS, but employed his own staff and paid his own overhead and operating expenses. The agreements with IDS prohibited Smithson from procuring or servicing investment products or insurance products that were not acquired through IDS.

Smithson's agreements with IDS also prohibit him, for a period of one year after leaving IDS, from, *inter alia,* "directly or indirectly offer[ing] for sale, sell[ing] or seek[ing] an application for any Product or Service issued or provided by any company to or from a Client [Smithson] contacted, dealt with or learned about while [Smithson] represented IDS or an Affiliate or Issuer or

because of that representation." Verified Complaint, Exhibit A at § IV 1(g). This restriction applies for the territory wherein Smithson "sought applications for Products or Services" pursuant to the agreements. *Id.* The agreements define "Client" to mean:

person or entity who (1) purchases or holds a Product or Service acquired from or through IDS or an Affiliate or one of their Planners with the consent of IDS or the Affiliate, or (2) authorized IDS, an Affiliate or one of their Planners to make personal financial planning presentations to it or its employees or members, or (3) is a member of a Client's household.

Verified Complaint, Exhibit A at § I 1(p) & Exhibit B at § I 1(m).

In September 1993, Smithson and SunAmerica discussed the prospects of Smithson selling financial products and services for SunAmerica. Smithson resolved to quit IDS and signed an agreement with SunAmerica in November 1993. In preparation for his move to represent SunAmerica, Smithson compiled a list of IDS customers with whom he had discussed his plans to leave IDS. He believed some would follow him to SunAmerica. Subsequently, Smithson contacted these IDS clients and informed them of his intention to leave IDS and the reasons for the move. Among the reasons Smithson provided was that he found it difficult to address his client's needs as a financial adviser "when all the business that I placed had to be with one company...." Smithson Dep. at 151–52. Smithson further felt that the market value of his business was low because of his contractual relationship with IDS. Smithson Dep. at 152–53.

Smithson then copied, first at the IDS office and later at his new office, the files of those he considered his best customers. Smithson has also produced at least nine boxes of IDS customer documents, consisting of entire files or major portions of files, which include insurance contracts and wills. Many of the documents in Smithson's possession are originals.

Smithson knew that he would lose his clients if he left IDS because of his agreements with IDS, and was afraid that his business would be adversely impacted if he could not remain in contact with his former clients. Therefore, on December 14, 1993, Smithson mailed a letter on IDS letterhead to the IDS customers to whom Smithson was assigned—at least 250 people. The mailing included a map to Smithson's new office. The letter read, "The purpose of this letter is to notify you of the relocation of our office facilities." Verified Complaint, Exhibit E. It continued, "We are moving into space that will allow us to better serve your needs over the coming years" and "[w]e look forward to our continuing relationship and wish you a prosperous new year. Please call on us if you have any questions." *Id.* What is most telling about the letter is the absence of any statement informing the clients of Smithson's intention to leave IDS for SunAmerica.

Many of the clients contacted by Smithson responded by calling IDS. On December 17, 1993, IDS's Division Vice President approached Smithson about the phone calls and Smithson resigned. There is evidence that contact between IDS customers and Smithson has continued subsequent to the termination of Smithson's relationship with IDS.

IDS filed a verified complaint on December 30, 1993 seeking a temporary restraining order, a preliminary injunction, a permanent injunction, damages, and other relief against Smithson. A temporary restraining order was issued on January 5, 1994 and later extended by agreement. IDS contends that Smithson violated the terms of his personal financial planner's agreements, his fiduciary duties, the Lanham Act, the Illinois Deceptive Trade Practices Act, the Illinois Trade Secrets Act, and his common law tort duties by soliciting and continuing to solicit IDS customers acquired through his affiliation with IDS; by converting and continuing to convert IDS trade secrets and confidential IDS customer information for his own use; and by diverting IDS customers to himself. IDS seeks to prevent Smithson from using IDS's trade secrets and other proprietary information for his own personal benefit and seeks a return of the proprietary information. IDS now seeks to convert the temporary restraining order into a preliminary injunction.

418

## DISCUSSION

■ In order to grant a preliminary injunction, the court must find: (1) the plaintiffs have at least a reasonable likelihood of success on the merits; (2) the plaintiffs have no adequate remedy at law and will be irreparably harmed if the injunction does not issue; (3) the threatened injury to the plaintiffs outweighs the threatened harm the injunction may inflict on the defendant; and (4) the granting of a preliminary injunction will not disserve the public interest. *Adams v. Attorney Registration and Disciplinary Comm'n of Supreme Court,* 801 F.2d 968, 971 (7th Cir.1986) (citing *Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Prods., Inc.,* 545 F.2d 1096, 1097 (7th Cir.1976)); *see also Roland Mach. Co. v. Dresser Indus.,* 749 F.2d 380, 386–89 (7th Cir.1984). The plaintiffs have the burden of proving each of these factors. *Roland v. Air Line Employees Ass'n, Int'l,* 753 F.2d 1385, 1392 (7th Cir. 1985). The ultimate decision in weighing and balancing these factors requires a high degree of discretion on the part of the district judge. *Adams,* 801 F.2d at 971. The plaintiffs have met their burden in this case.

■ IDS has a reasonable likelihood of success on the merits under counts I and IV. Minnesota law recognizes and enforces reasonable restrictive covenants such as those which prohibit former employees from contacting former customers. *See Medtronic, Inc. v. Gibbons,* 527 F.Supp. 1085, 1091–92 (D.Minn.1981) (if departing sales representative could immediately call on the same customers on behalf of a competitor, then former employer would be unfairly disadvantaged), *aff'd,* 684 F.2d 565 (8th Cir.1982); *Walker Employment Serv., Inc. v. Parkhurst,* 300 Minn. 264, 219 N.W.2d 437, 441–42 (1974) (restrictive covenant prohibiting former employee from working for competitor for one year in county where he previously worked upheld). Smithson has admitted much of the allegations concerning his contact with IDS clients to inform them that he was leaving IDS, and has admitted to the copying of client information. IDS has demonstrated that it is likely to succeed on the merits of its claim that Smithson solicited or accepted business from former clients and removed and copied customer files in violation of his agreements with IDS. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cunningham,* 736 F.Supp. 887, 890 (N.D.Ill. 1990) (injunctive relief granted where personal and confidential client information clandestinely removed and copied; some of these clients received solicitation letters from defendants encouraging then to transfer their accounts).

■ Additionally, § 2(d) of the Illinois Trade Secrets Act, 765 ILCS 1065/2(d), protects IDS's interest in the confidential information such as customer identity, addresses, and financial data. IDS has sufficiently demonstrated for purposes of a preliminary injunction that IDS derives economic value from the confidential information and that it has taken reasonable steps to preserve the confidentiality of the information. The agreements demonstrate the importance that IDS places on the information. The agreements state that the information obtained during Smithson's affiliation with IDS are confidential and also that the information is considered the property of IDS. An injunction is therefore appropriate to protect IDS's proprietary interest in these trade secrets and to prevent the secrets from being disclosed to competitors or unjustly used by Smithson for his own benefit. *See* 765 ILCS 1065/3 ("Actual or threatened misappropriation [of trade secrets] may be enjoined"); *American Can Co. v. Mansukhani,* 728 F.2d 818, 820 (7th Cir.1982) (injunction appropriate against former employee subject to confidentiality agreement who obtained information through confidential relationship).

■ IDS does not have an adequate remedy at law and will be irreparably harmed if the injunction does not issue. Where trade secrets and goodwill are involved, the threat is significant that the harm experienced by the misappropriation or misuse of trade secrets will be irreparable. *See Medtronic, Inc.,* 527 F.Supp. at 1091. Actually, once solicitation of clients began, the harm is done. Clients may begin to question the wisdom of remaining with a company involved in litigation with a former representative over their confidential information. Additionally, once the trade secrets are dis-

closed they will no longer be confidential and their value to IDS will be decreased.

The threatened injury to IDS outweighs the threatened harm an injunction may inflict on Smithson. Although Smithson's business may be reduced considerably by an injunction preventing him from servicing his former clients, Smithson is not precluded from engaging in the business of financial planning itself. The injunction does not prevent Smithson from dealing with new clients he acquires independently. Furthermore, the conduct prohibited by the injunction is only conduct that is unfair to begin with. Smithson agreed to abide by the terms of the restrictive covenant when he began working with IDS and cannot now complain that he is thereby harmed unfairly by it.

IDS has demonstrated that the granting of a preliminary injunction will not disserve the public interest. IDS's clients, innocent third parties, will be protected by the maintenance of the status quo, that is by preventing Smithson from diverting their business from IDS or from misleading IDS clients into believing that he can still personally serve their financial needs. The injunction will make it clear that the clients are still being served by IDS, albeit absent Smithson's services. Without the injunction Smithson could use his relationship with his former clients to unfairly persuade them to change their accounts over to IDS's competitor. Smithson cannot now blatantly mislead the clients he has been serving into believing that they are still somehow being served by IDS notwithstanding Smithson's new affiliation with SunAmerica.

■ Smithson has not persuaded the court that IDS cannot likely succeed on its claims. Smithson contends that the restrictive covenant at issue is overbroad and unenforceable as to an independent contractor. But Smithson cannot complain that IDS's contract forced him to do what he agreed to do in the contract. The terms of the agreement are clear. That many of Smithson's clients are friends and were acquired through hard work and long hours is of no significance. The hard work and long hours were engaged in for the benefit of IDS and were an essential part of his agreements with IDS. Smithson was aware from his agreements that no matter how he found his clients, he was limited to using IDS's products or services and that the clients would thus be serviced only by IDS. If Smithson did not like the arrangement offered by IDS, then he should not have accepted it.

Smithson further asserts that an injunction would be contrary to the public interest and contrary to IDS's fiduciary duties to its own clients. Smithson contends that his clients "are entitled to know his whereabouts and the truth of the situation surrounding his resignation...." Def.'s Memo. in Opposition to Pltf.'s Mot.Prelim.Inj. at 14. This assertion is spurious. Smithson's December 14, 1993 letter is hardly an honest attempt at keeping in touch with his clients. Smithson was attempting to maintain client contact and to withhold the truth behind his affiliation with SunAmerica, in order to violate his agreements with IDS. As the court noted above, it is Smithson's conduct—not IDS's— that may potentially harm the clients if allowed to continue.

■ Smithson is accordingly enjoined from selling products or services to the 250 to 340 admitted IDS customers that Smithson had been serving as an IDS representative. All of the clients were acquired while Smithson was affiliated with IDS. The injunction will also limit Smithson's access to these IDS clients in order to prevent him from overreaching and violating the terms of his agreements by persuading the clients to stop using the products or services of IDS or to start using the products or services of SunAmerica.

The court is not granting the full relief requested. The order is limited specifically to the 250 to 340 people who were customers of Smithson. IDS has not produced enough evidence that there are individuals "learned about" or "whose name became known to" Smithson while Smithson was in a relationship with IDS and has not produced evidence to demonstrate the circumstances surrounding how Smithson would have "learned about" these people. The injunction would not cover those situations where names became known to Smithson informally and indi-

rectly while he was with IDS, that is those not disclosed to him in confidence for the purpose of being served by Smithson or not acquired through contacts with other customers. Although the issue is not ready for adjudication on this motion for preliminary injunction, the issue remains contestable at trial.

## CONCLUSION

For the above stated reasons, the motion for a preliminary injunction is granted.

IT IS SO ORDERED.