**IDS LIFE INSURANCE COMPANY, Plaintiff–Appellee,**

v.

**SUNAMERICA, INC., Royal Alliance Associates Inc., SunAmerica Securities Inc. and Sun Life Insurance Company of America, Defendant–Appellants.**

**AMERICAN EXPRESS FINANCIAL ADVISORS, INC., Plaintiff–Appellee,**

v.

**SUNAMERICA, INC., Royal Alliance Associates Inc., SunAmerica Securities Inc. and Sun Life Insurance Company of America.**

Nos. 95 C 1204, 95 C 1212.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 3, 1997.

**1262**

Gary Michael Elden, Eric D. Brandfon-brener, Patrick Thomas Nash, Margaret E. Rice, Brian Lee Pengra, Grippo & Elden, Chicago, IL, for IDS Life Ins. Co.

Ronald P. Kane, Steven P. Gomberg, Gomberg, Kane & Fischer, Ltd., Chicago, IL, Pace Klein, Thomas M. Campbell, Smith, Campbell & Paduano, New York City, for SunAmerica, Inc., Royal Alliance Associates, SunAmerica Sec. Inc. and Sun Life Ins. Co. of America.

## MEMORANDUM OPINION AND ORDER

ANDERSEN, District Judge.

This case is before the court on the following motions: defendant SunAmerica, Inc.'s ("SunAmerica") motion to dismiss for lack of personal jurisdiction; plaintiffs IDS Life Insurance Company ("IDS") and American Express Financial Advisors, Inc. ("American Express") motion for preliminary and permanent injunctive relief; plaintiffs' motion in limine; and defendants, Royal Alliance Associates, Inc. ("Royal"), SunAmerica Securities, Inc. ("SunAmerica Securities"), SunAmerica, and Sun Life Insurance Company of America ("Sun Life") motion in limine.[1] For the reasons stated below, we grant SunAmerica's motion to dismiss for lack of personal juris-

diction, grant in part and deny in part plaintiffs' motion for injunctive relief, deny plaintiffs' motion in limine, and grant in part and deny in part defendants' motion in limine.

## BACKGROUND

Plaintiffs have filed two substantially identical amended complaints against defendants seeking injunctive relief. Plaintiffs assert five causes of action against defendants: unfair competition and tortious interference with contract; violations of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); violations of the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.;* misappropriation of trade secrets; and intentional interference with business relationships.

Plaintiffs claim that defendants are inducing plaintiffs' sales agents to leave plaintiffs and earn windfall profits for both the agents and defendants by switching plaintiffs' customers out of the insurance and securities products these customers hold through plaintiffs and re-selling these customers new insurance and securities products through defendants. Plaintiffs claim that such conduct is prohibited by the agents' contracts with plaintiffs and by state insurance laws. Plaintiffs further claim that defendants actively induce plaintiffs' agents to engage in this conduct by indemnifying the agents and otherwise assisting them and rewarding them for this conduct. As a result, plaintiffs claim that defendants have wrongfully destroyed thousands of plaintiffs' long-term customer relationships, injured plaintiffs' business reputation, and misused plaintiffs' confidential and trade secret information—all causing plaintiffs significant and irreparable harm. Plaintiffs claim that defendants' wrongful actions in this longstanding dispute have been occurring since the late 1980's through defendants' predecessor or present companies.

Prior to being hired by plaintiffs, applicants to be agents who will sell plaintiffs' financial products, receive an orientation and training program administered by plaintiffs.

---

1. The parties have submitted extensive briefs and exhibits on the motions currently before the court. The parties have presented no testimony in this court on these motions, but have instead requested that we decide the motions on the papers submitted. The exhibits exceed 3300 pages in length.

On-the-job training and formal course work continues during their first year with the company. During their first year, agents are assigned to work one-on-one with an experienced field trainer. Throughout their careers, plaintiffs continue to provide conferences, seminars, and other continuing education programs, including professional designation study and examinations, to update agents' knowledge and skills. Plaintiffs also provide a variety of computer software to their agents.

Applicants are provided with copies of the contract ("the Contract") which governs plaintiffs' relationship with its agents. As a condition of their appointment, all plaintiffs' agents are required to execute this Contract. Applicants are given as much time to review the proposed Contract as they wish and may seek counsel before entering into it. The Contract is counter-signed by plaintiffs and becomes effective when the applicant completes the pre-appointment process and decides to work for plaintiffs.

After the first year, the agents sell plaintiffs' products and services as independent contractors. The agents lease office space and the majority of equipment from plaintiffs, but employ their own staff and pay their own overhead and operating expenses. The Contracts with plaintiffs prohibit the agents from procuring or servicing investment products or insurance products that were not acquired through plaintiffs.

Plaintiffs' Contracts also contain several covenants. One covenant in the Contracts prohibits agents, for a one-year period after leaving plaintiffs employment, from soliciting or selling insurance or securities products in the territory where they worked for plaintiffs to the clients disclosed to them while working for plaintiffs. The Contracts provide that:

For one year after this Agreement ends, you agree that you will not, in the territory where you sought applications for Products or Services under this or any other agreement with IDS Life [American Express] or an Affiliate, directly or indirectly offer for sale, sell or seek an application for any Product or Service issued or provided by any company to or from a Client you contacted, dealt with or learned about while you represented IDS Life [American Express] or an Affiliate or because of that representation.

IDS and American Express Contracts at Section IV.1(g).

Other covenants in plaintiffs' Contracts prohibit agents, during and after their affiliation with plaintiffs, from disclosing the identities of plaintiffs' clients and from otherwise misusing confidential and trade secret information obtained through plaintiffs. Plaintiffs' Contracts provide that:

While this Agreement is in effect and after it ends, you agree that you will not reveal the contents of any IDS Life [American Express] property or allow them to be revealed, except in connection with carrying out your duties under the Agreement. You will not reveal the names or addresses of IDS Life [American Express] Clients or any other information about them, including financial information.

. . . . .

All [client] Records and Materials are the property of IDS Life [American Express], an Affiliate or one of their associated companies. All rights to Records and Materials that you prepare or create in connection with the performance of this Agreement are hereby assigned to IDS Life [American Express]. You agree that you will not allow the reproduction of the Records and Materials in any manner whatsoever, except pursuant to written policy or consent of IDS Life [American Express].

. . . . .

You agree that the identity of Clients and potential Clients is confidential information. For one year after this Agreement ends, you agree not to use any such information in connection with any business in competition with IDS Life [American Express] or an Affiliate.

IDS and American Express Contracts at sec. IV.1(e), (c) and (f).

Another covenant in plaintiffs' Contracts requires agents to return all confidential and proprietary business documents and files

upon leaving plaintiffs employment. The Contracts provide:

> You are responsible for the safekeeping of these items ... When this Agreement ends, all of these items remain IDS [American Express] property. You must return all of them, ... without demand or compensation.

IDS and American Express Contracts at sec. IV.1(d).

Except for the one-year limitation on sales of products and services to the clients formerly assigned to them and the restrictions on the use of plaintiffs' confidential and trade secret information, the covenants in plaintiffs' Contracts with its agents do not restrict to whom the agents may sell or where, how or for whom they may work after leaving plaintiffs.

Defendants claim that plaintiffs lose numerous agents every year to competitors. Defendants present the following evidence: In past years, agent defections from plaintiffs to their competitors have occurred at a rate of more than 500 per year; up to 70% of all agents appointed by plaintiffs leave the firm within four years; of the agents who leave annually, over 40% are acknowledged to join competitors; fewer than 2.3% of plaintiffs' agents who have re-affiliated with competitors in recent years have done so with defendants. Moreover, defendants claim that plaintiffs are thriving because they have a customer retention rate of 93.3% and their net income rose 20% to $428 million in 1994.

Plaintiffs seek to restrain defendants from continuing to convert plaintiffs' securities and insurance customers and customer assets. Plaintiffs are not seeking to enjoin defendants from hiring plaintiffs' agents, but merely to restrain defendants from taking its clients, client assets, trade secrets and copyrighted material in violation of the Contracts.

We have previously held that plaintiffs' claims against SunAmerica Securities, Inc. and Royal Alliance Associates, Inc. are subject to arbitration, while plaintiffs' claims against defendants SunAmerica, Inc. and Sun Life Insurance Company of America are not subject to arbitration. Plaintiffs seek a preliminary injunction as to the claims that are subject to arbitration and a permanent injunction as to the claims that are not subject to arbitration. However, we decline to address plaintiffs' motion for permanent injunctive relief at this stage. Therefore, at this time, we rule only on plaintiffs' motion for preliminary injunctive relief and leave decision on plaintiffs' application for permanent injunctive relief to another day.

## DISCUSSION

### I. SUNAMERICA'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

This Court has personal jurisdiction over a non-resident defendant only if an Illinois court would have jurisdiction. *Nucor Corp. v. Aceros Y Maquilas de Occidente. S.A. de C.V.,* 28 F.3d 572 (7th Cir.1994); *FMC Corp. v, Varonos,* 892 F.2d 1308, 1310 (7th Cir. 1990). Plaintiffs bear the burden of proving sufficient facts to establish personal jurisdiction. *E.J. McGowan & Associates, Inc. v. Biotechnologies, Inc.,* 736 F.Supp. 808, 809 (N.D.Ill.1990); *Grafon Corp. v. Hausermann,* 602 F.2d 781, 783 (7th Cir.1979). Plaintiffs must first establish the existence of jurisdiction under Illinois law and then show that the exercise of jurisdiction over the defendant will not offend due process. *Jacobs/Kahan & Co. v. Marsh,* 740 F.2d 587, 589 (7th Cir.1984); *Harold M. Pitman Co. v. Typecraft Software Ltd.,* 626 F.Supp. 305, 308 (N.D.Ill.1986).

There are two ways in which a plaintiff can establish personal jurisdiction over a nonresident corporate defendant. First, Illinois' long-arm statute permits the exercise of jurisdiction over claims which arise out of the defendant's transaction of business, or commission of a tort, in Illinois. 735 ILCS 5/2–209(a)(1) and (2). The transaction of business test may be satisfied by an isolated act as long as plaintiff's claim arises out of that act. *Marsh,* 740 F.2d at 591; *Johnston v. United Presbyterian Church in U.S. of America, Inc.,* 103 Ill.App.3d 869, 59 Ill.Dec. 518, 431 N.E.2d 1275 (1981). Second, the long-arm statute also provides that an Illinois court may exercise jurisdiction over a "corporation doing business within this

State." 735 ILCS 5/2–209(b)(4). A corporation is "doing business" in Illinois if it engages in regular activities in Illinois, not occasionally or casually, but with "a fair measure of permanence and continuity." *Michael J. Neuman & Associates, Ltd, v. Florabelle Flowers, Inc.*, 15 F.3d 721, 724 (7th Cir.1994); *Cook Associates, Inc., v. Lexington United Corp.*, 87 Ill.2d 190, 57 Ill.Dec. 730, 429 N.E.2d 847 (Ill.1981). The decision as to whether a corporation's in-State activities are sufficiently permanent and continuous to qualify as "doing business" is to be made on a case-by-case basis and depends on the unique situation presented by a particular case. *Hulsey v. Scheidt,* 258 Ill.App.3d 567, 572, 196 Ill.Dec. 740, 743, 630 N.E.2d 905, 908 (1994); *Maunder v. DeHavilland Aircraft of Canada, Ltd.*, 102 Ill.2d 342, 80 Ill.Dec. 765, 466 N.E.2d 217 (Ill.1984), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984).

The constitutional due process analysis for personal jurisdiction imposes two requirements. First, the defendant must have sufficient minimum contacts with the state to comport with "traditional notions of fair play and substantial justice." *See International Shoe Co. v. State of Washington, Office of Unemployment Compensation and Placement,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). The defendant must purposefully avail himself of the privilege of conducting activities in the forum state such that he invokes the benefits and protections of the law. *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). His activities must be of the quality and nature that he would anticipate being haled into that jurisdiction's court, *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), and the relationship with the forum must not be "random, fortuitous, or attenuated." *Burger King Corp.*, 471 U.S. at 475–76, 105 S.Ct. at 2183–84. Second, there must be reasonably adequate notice to afford the party an opportunity to defend. *Id.*

## A. *SunAmerica's Commission of a Tort in Illinois*

The Illinois long-arm statute gives Illinois courts jurisdiction over causes of action arising from the "commission of a tortious act within this State." 735 ILCS 5/2–209(a)(2). Plaintiffs contend that SunAmerica is subject to the court's jurisdiction as a result of tortious acts allegedly committed directly by SunAmerica, or which SunAmerica controlled or directed the defendant subsidiaries in committing.

■ Plaintiffs generally assert that SunAmerica has committed tortious acts against plaintiffs in Illinois. The tortious acts alleged by plaintiffs concern the improper solicitation of plaintiffs' financial planners. However, plaintiffs have presented no evidence that SunAmerica itself committed these wrongdoings.

Plaintiffs argue that we should exercise jurisdiction over SunAmerica because the complaints allege that SunAmerica committed tortious acts against Plaintiffs in Illinois. However, the complaints do not anywhere contain specific allegations that *SunAmerica* committed tortious acts. The specific paragraphs of the complaints which plaintiffs identify as support for their contention do not even mention SunAmerica, much less establish that SunAmerica has committed any tortious acts. Significantly, throughout the complaints, plaintiffs refer only to alleged conduct by the defendant subsidiaries, without ever attributing the conduct to SunAmerica.

Having failed to establish that SunAmerica itself directly committed torts in Illinois, plaintiffs next argue that jurisdiction is proper because SunAmerica directed and/or controlled its subsidiary defendants in committing the tortious acts alleged in the complaints.

■ It is well-established that the existence of a parent-subsidiary relationship is generally not a sufficient basis for exercising personal jurisdiction over an out-of-state parent. *Integrated Business Information Service (Proprietary) Ltd. v. Dun & Bradstreet Corp.*, 714 F.Supp. 296, 299 (N.D.Ill.1989). In *Integrated Business,* the court held that

jurisdiction over the local subsidiary does not confer jurisdiction over the foreign parent if the subsidiary's presence in the state is primarily for the purpose of carrying on its own business and the subsidiary has preserved some semblance of independence from the parent. *Integrated Business,* 714 F.Supp. at 299, 301.

Thus, in order for plaintiffs to establish personal jurisdiction over SunAmerica based on their theory that SunAmerica directed or controlled the actions of the defendant subsidiaries, plaintiffs must present sufficient evidence to show that SunAmerica exerted substantial control over its subsidiaries. Plaintiffs have failed to meet this burden.

In *Integrated Business,* the court noted that the cases in which Illinois courts have found that a parent company sufficiently controlled its subsidiary to vest the court with jurisdiction, involved subsidiaries which existed for the sole purpose of selling or servicing the parent corporation's products. *Id.* at 300 (*citing Maunder v. DeHavilland Aircraft of Canada,* 102 Ill.2d 342, 80 Ill.Dec. 765, 466 N.E.2d 217, *cert. denied,* 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984); *Schlunk v. Volkswagenwerk Aktiengesellschaft,* 145 Ill.App.3d 594, 105 Ill.Dec. 39, 503 N.E.2d 1045 (1st Dist.1986), *aff'd on other grounds,* 486 U.S. 694, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988)). In this case, it has not been shown that the subsidiaries exist for the sole purpose of selling SunAmerica's products.

Finally, the *Integrated Business* court found that absent the type of control inherent in cases such as *Schlunk* and *Maunder,* the "overlap of executives and directors" between the parent and subsidiary ... "does not approach the level of control" required to vest the Court with jurisdiction. 714 F.Supp. at 300. Likewise, in *Main Bank of Chicago v. Baker,* 86 Ill.2d 188, 56 Ill.Dec. 14, 427 N.E.2d 94 (1981), the court held that for corporate identity to be disregarded it must be shown that one corporation is so controlled and its affairs so conducted that it is a mere instrumentality of another, and that observance of the fiction of separate existence would promote injustice.

In this case, SunAmerica and the defendant subsidiaries maintain separate corporate records and comply with corporate formalities. Moreover, the defendant subsidiaries are not undercapitalized and the corporate funds are not co-mingled. There is simply no evidence to support plaintiffs' theory that jurisdiction is warranted over SunAmerica because the entities are so co-mingled that they are mere instrumentalities of each other.

Plaintiffs argue that SunAmerica has a general oversight role in the subsidiaries' recruiting of agents. This court has recognized that general oversight alone by a parent corporation does not warrant jurisdiction. *J.D. Marshall Intern., Inc. v. Redstart. Inc.,* 1989 WL 165070 (N.D.Ill.1989). In *J.D. Marshall,* the court stated:

It is an economic fact of life that subsidiaries are subject to the overall direction of the parent, with a unity of interest and common objectives, as the Supreme Court pointed out in a different context in *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 771–774, 104 S.Ct. 2731, 2741–43, 81 L.Ed.2d 628 (1984) ... The evidence adduced by plaintiff discloses normal parent-subsidiary relationships, but no more. It does not establish the intrusive control of insubstantial subsidiaries by a parent which lead to a disregard of the separate corporate entities.

*Id.* at *2 (*citing Savin Corp. v. Heritage Copy Products,* 661 F.Supp. 463 (M.D.Pa. 1987)). Therefore, we reject plaintiffs' argument.

Plaintiffs next argue that SunAmerica's control over the defendant subsidiaries is evidenced by its alleged involvement in day-to-day decision making at the subsidiaries. The only proof offered of this alleged involvement is the deposition testimony of Gary Krat, a SunAmerica senior officer and chief executive/senior officer and director of the subsidiaries. However, Krat's testimony does not prove plaintiffs' contention. When asked what role Mr. Krat has with respect to recruiting for either SunAmerica Securities or Royal, he answered that he has none. Krat Dep. Tr. (Ex. 61) at 50–51, 53.

Plaintiffs asked Mr. Krat whether he ever meets with SunAmerica Securities or Royal recruits. Regarding SunAmerica Securities, Krat answered that he did not meet recruits. Krat Dep. Tr. (Ex. 61) at 53. For Royal, he explained that he is "typically asked to greet people to the extent I'm available in the office, or I'm walking around the office." Krat Dep. Tr. (Ex. 61) at 51. Such impromptu meetings certainly do not exemplify the type of control over recruitment that would justify asserting personal jurisdiction over SunAmerica.

As further evidence of SunAmerica's purported involvement with the defendant subsidiaries, plaintiffs claim that Mr. Krat meets with agents defendants are recruiting from plaintiffs. They claim that this is established by the deposition testimony of Susan Harris and Francis Hayes. The sum total of Mr. Hayes' testimony in this regard is as follows:

Q: Does Mr. Krat ever meet with recruits.

A: Very infrequently.

Hayes Dep. Tr. (Ex. 56) at 39. Ms. Harris testimony is similarly unhelpful to plaintiffs. She merely states, in response to a question whether Mr. Krat is involved in recruitment for the broker/dealers, "I assume that would be part of his executive responsibilities." Harris Dep. Tr. (Ex. F) at 124.

Finally, plaintiffs contend that SunAmerica's control over the alleged tortious acts of the defendant subsidiaries is evidenced by the fact that SunAmerica's President, Eli Broad, has announced to the investing community his plans to increase the SunAmerica sales force. Even if plaintiffs' evidence could establish the foregoing, it does not follow that SunAmerica controls the defendant subsidiaries or directed them to engage in the alleged wrongful conduct set forth in the complaints. As discussed above, it is normal and expected that parent and subsidiary corporations will have a unity of interest and, thus, the fact that the president of a parent company would foster expectations of growth by its subsidiaries is of no jurisdictional import.

Thus, the record demonstrates that SunAmerica did not itself commit tortious acts against plaintiffs in Illinois, nor did it direct or control its subsidiaries' alleged commission of such acts. Accordingly, personal jurisdiction may not be asserted over SunAmerica pursuant to the "tortious act" provision of the Illinois long-arm statute.

**B. SunAmerica's Transaction of Business in Illinois**

Plaintiffs can establish personal jurisdiction over SunAmerica under the "doing business" test in one of two ways. First, jurisdiction may be proper if plaintiffs' claims arise out of SunAmerica's transaction of business in Illinois. In such a case, the test may be satisfied by even an isolated act so long as plaintiffs' claims arise out of that act. In this case, there is no evidence that plaintiffs' claims lie in the wake of SunAmerica's commercial activities in Illinois, and plaintiffs do not seriously contest this. Therefore, jurisdiction may not be asserted under this test.

■ The second way in which jurisdiction may be asserted under the "doing business" requirement is to establish that SunAmerica has been carrying on "continuous and systematic" business in Illinois, which can be unrelated to plaintiffs' claims. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 104 S.Ct. 1868, 1872–73, 80 L.Ed.2d 404 (1984).

In this case, plaintiffs have failed to demonstrate that SunAmerica conducts a "systematic and continuous" part of its general business in Illinois. SunAmerica is incorporated in Maryland with its principal place of business in Los Angeles, California. It has no property in Illinois,[2] is not registered to do business in Illinois, pays no taxes in Illinois, has no sales or other business office or employees in Illinois, and conducts no sales of products or services in Illinois.

Plaintiffs point to several purported contacts between SunAmerica and Illinois, which plaintiffs contend satisfy the requisite "continuous and systematic" business standard. We will address each contention in turn.

---

**2.** SunAmerica may possibly hold one mortgage on an Illinois warehouse and have a security interest in its collateral. This contention is addressed *supra*.

As evidence of SunAmerica's purported ongoing business in Illinois, Plaintiffs first assert that SunAmerica "borrowed tens of millions of dollars from a Chicago Bank." Plaintiffs cite to two credit agreements entered into by SunAmerica. Pursuant to the agreements, The First National Bank of Chicago and nine other banks agreed to make a designated amount of funds available to SunAmerica for a designated period of time. Plaintiffs offer no evidence that SunAmerica has ever drawn upon the funds made available by those institutions. Moreover, although the notice provisions in the agreements require that any notices be sent to the participating banks at their address, plaintiffs have not shown that SunAmerica has ever had any reason to send such a notice.

Furthermore, Susan Harris, who testified that she was involved in negotiating the credit agreements, stated that all of the negotiations were conducted with the lead bank, Citibank, which is not located in Chicago, but in New York. Thus, no evidence exists that SunAmerica had any contact whatsoever with the First National Bank of Chicago or the State of Illinois, in order to obtain the credit agreement.

While plaintiffs urge this court to find that the credit agreements evidence "significant and ongoing business in Illinois," they fail to support this contention. Even assuming that plaintiffs have on more than one occasion borrowed money from, and sent notices to, The National First Bank of Chicago pursuant to the agreements, the sporadic borrowing of money is neither regular, nor ongoing and cannot subject SunAmerica to the personal jurisdiction of this court.

Plaintiffs next claim that SunAmerica is "aggressively advertising and marketing its products[3] in Illinois." The only evidence that plaintiffs point to as proof of this contention is that: (1) SunAmerica has a site on the Internet; (2) SunAmerica has advertisements in *nationally* circulated newspapers and magazines; (3) SunAmerica advertises on *national* television; and (4) SunAmerica, in its *national* advertisements, provides a toll-free number.

Plaintiffs do not demonstrate that SunAmerica has directed *any* advertisements specifically to Illinois, or even to any region smaller than the entire country. They do not claim that SunAmerica had to travel to Illinois, or deal with any Illinois person or entity, in connection with its national advertising campaign. Thus, the national advertising campaign does not involve systematic and continuous contact with Illinois.

Plaintiffs ask this court to hold that any defendant who advertises nationally or on the Internet is subject to its jurisdiction. It cannot plausibly be argued that any defendant who advertises nationally could expect to be haled into court in *any* state, for a cause of action that does not relate to the advertisements. Such general advertising is not the type of "purposeful activity related to the forum that would make the exercise of jurisdiction fair, just or reasonable." *Rush v. Savchuk,* 444 U.S. 320, 329, 100 S.Ct. 571, 577, 62 L.Ed.2d 516 (1980) (citations omitted).

Similarly misplaced is plaintiffs' reliance on information contained in SunAmerica's Form 10–K, which references certain of SunAmerica's debt offerings in which The First National Bank of Chicago acts as indenture trustee, and a document entitled "Statement of Eligibility of Trustee." Neither of the foregoing documents provides any of the information that would be necessary to establish the extent of SunAmerica's contacts with Illinois resulting from the debt offerings.

Plaintiffs do not offer any evidence indicating where the indentures were negotiated or signed, whether SunAmerica is required to travel to Illinois, or to communicate with the trustee in Illinois in connection with those agreements. Thus, plaintiffs' evidence does not support plaintiffs' assertion that the bond indentures demonstrate systematic and continuous contacts with Illinois.

Plaintiffs likewise cannot hope to sustain personal jurisdiction over SunAmerica by reliance on "swap" agreements allegedly entered into with The First National Bank of Chicago. Plaintiffs do not offer any specific

---

3. SunAmerica does not have products, out plaintiffs presumably refer to the fact that SunAmeri-

ca's national campaign advertises generally the services and products of all of its subsidiaries.

evidence regarding the nature and extent of SunAmerica's contacts with Illinois which exist as a result of the swap agreements.

A swap agreement, like a credit agreement, is an agreement that entitles SunAmerica to engage in a certain transaction during the duration of the agreement, but does not require that it do so. Plaintiffs do not offer any evidence as to whether SunAmerica has actually engaged in any "swaps" with The First National Bank of Chicago pursuant to the agreements. Plaintiffs also offer no authority to show that engaging in the swaps would provide the requisite minimum contacts with Illinois. As such, plaintiffs cannot demonstrate that it would be fair and reasonable for SunAmerica to expect to be haled into an Illinois court by the mere existence of the swap agreements.

Plaintiffs also represent that SunAmerica has engaged in "millions of dollars of dollar roll and reverse repo" transactions in Illinois. However, plaintiffs have brought forth no evidence that these transactions ever took place. The evidence cited by plaintiffs merely confirms that SunAmerica engages in "dollar rolls" and "reverse repos," without indicating where. Moreover, plaintiffs have failed to demonstrate the nature and quality of SunAmerica's alleged contacts with Illinois in connection with these purported investments. Having failed to establish that such contacts are systematic and continuous, plaintiffs cannot rely on the existence of "dollar roll" or "reverse repo" transactions to confer personal jurisdiction over SunAmerica.

Plaintiffs next assert that defendants hold mortgage loans on Illinois properties, pursuant to which SunAmerica "has recorded numerous security interests in Illinois inventories and other assets." Plaintiffs allege that SunAmerica has a $4,000,000 interest in a warehouse in Illinois and, pursuant to that mortgage, holds security interests on collateral such as accounts receivable in Illinois.

The most that plaintiffs have demonstrated, assuming the validity of their evidence, is that SunAmerica holds, or at some point held, one mortgage in Illinois with related collateral. This does not constitute systematic and continuous contacts with Illinois sufficient to ground personal jurisdiction over SunAmerica.

Plaintiffs next claim that SunAmerica holds senior secured loans made to 103 borrowers in 30 industries, including loans to Illinois borrowers secured by Illinois assets. Plaintiffs cite to a specific page in SunAmerica's Form 10–K to support this contention. However, that document does not contain any indication as to whether SunAmerica holds any senior secured loans in Illinois.

Plaintiffs also contend that SunAmerica is a general partner in numerous partnerships that own Illinois real estate. However, none of the abstracts demonstrates that SunAmerica, or any partnership in which SunAmerica may be a partner, owns real property in Illinois. Rather, the collateral listed on the documents are contract rights, inventory and accounts receivable. Moreover, plaintiffs' reliance upon a Lexis/Nexis document reporting the sale of a property in Illinois by a seller named Sun Leaf L.P. also does not support their jurisdiction argument. The report does not mention SunAmerica. In addition, plaintiffs do not offer any evidence to establish that SunAmerica has any relationship with Sun Leaf L.P. or the property that is the subject of the report.

The absence of any facts in the record establishing substantial SunAmerica Illinois-based partnership holdings is fatal to plaintiffs' position. Here too, plaintiffs have failed to establish sufficient minimum contacts between SunAmerica and Illinois upon which SunAmerica could reasonably anticipate being compelled to litigate there and upon which this court could determine that jurisdiction over SunAmerica is just, fair and reasonable.

Finally, Plaintiffs' reference to SunAmerica's purchase of a broker-dealer subsidiary of an Illinois-based corporation does not salvage its jurisdictional argument. According to plaintiffs' evidence, the broker-dealer is based in Texas. Plaintiffs fail to state where the negotiations or the deal itself took place, or what law governs the sales contract itself. The evidence cited by plaintiffs is inherently unreliable and, without more, does not confer the court with personal jurisdiction.

Thus, all of the contacts plaintiffs rely on in their attempt to defeat SunAmerica's motion to dismiss are fatally deficient to establish jurisdiction. Although plaintiffs have shown that SunAmerica may have entered into transactions with the First National Bank of Chicago, they have made no showing that SunAmerica has initiated any transaction in Illinois, that any agreement was entered into in Illinois or that SunAmerica has entered into any contract to be performed in Illinois. Illinois courts distinguish "between the transaction of business in Illinois and the transaction of business with an Illinois corporation. Only the former constitutes grounds for exercising in personam jurisdiction over a foreign defendant...." *Wessel Co., Inc. v. Yoffee & Beitman Management Corp.*, 457 F.Supp. 939, 941 (N.D.Ill.1978) (emphasis added).

Moreover, the contacts cited by plaintiffs are isolated and sporadic. Thus, they fail to rise to the level of "systematic and continuous" contacts such that SunAmerica may be said to have "purposefully" availed itself of the privilege of conducting activities within Illinois. Plaintiffs have failed to satisfy their burden of demonstrating that SunAmerica's contacts with the State of Illinois are anything more than random, fortuitous, or attenuated. As a result, personal jurisdiction does not lie over SunAmerica under the "doing business" requirement.

### C. *Due Process*

■ The exercise of personal jurisdiction over SunAmerica in connection with this action is constitutionally impermissible since it would "offend 'traditional notions of fair play and substantial justice.'" *See International Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement*, 326 U.S. 310, 316, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945) (citation omitted). As determined by the Supreme Court, several factors determine the fairness of a state court's exercise of jurisdiction over a defendant. Included among those factors are: the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 113, 107

S.Ct. 1026, 1032–33, 94 L.Ed.2d 92 (1987) (*quoting World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 559, 564–65, 62 L.Ed.2d 490 (1980)). Applying these considerations to the facts of this case renders it clear that haling SunAmerica into an Illinois court would violate due process. Most significantly, neither plaintiffs nor the State of Illinois has a significant interest in adjudicating the case in Illinois. Neither plaintiff is a citizen of Illinois. American Express Financial Advisors, Inc. is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. IDS Life Insurance Company is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.

Moreover, with respect to the State of Illinois, its citizens do not have any involvement in this dispute involving large foreign corporations. Moreover, Illinois substantive law has no application to any of the contracts at issue. All parties agree that the subject contracts are governed by Minnesota law. Plainly, Illinois does not have a compelling interest in adjudicating this dispute. *Cf., United Airlines, Inc., v. ALG. Inc.*, 873 F.Supp. 147, 152 (N.D.Ill.1995); *Vandeveld v. Christoph*, 877 F.Supp. 1160, 1165–66 (N.D.Ill.1995). Correspondingly, because plaintiffs indisputably are both multi-billion dollar corporations, plaintiffs will sustain no undue burden in properly litigating its claims against SunAmerica in another state.

As demonstrated above, SunAmerica's contacts with Illinois are random, fortuitous and attenuated such that it could not reasonably anticipate being haled into court in Illinois. The exercise of personal jurisdiction over SunAmerica would not be fair and reasonable, but instead would be offensive to "traditional notions of fair play and substantial justice." Accordingly, the Due Process Clause of the United States Constitution mandates that this court not exercise personal jurisdiction over SunAmerica. SunAmerica's motion to dismiss is therefore granted.

### D. *Alleged Discovery Violations*

■ Plaintiffs also claim that this court has personal jurisdiction over SunAmerica by virtue of defendants' alleged non-compliance

with their discovery obligations. We reject this argument.

Plaintiffs' dissatisfaction with certain answers of SunAmerica's Rule 30(b)(6) witness cannot form the predicate for a finding of personal jurisdiction over SunAmerica. Plaintiffs took the deposition of Susan Harris, SunAmerica's Rule 30(b)(6) witness, in August 1995. More than nine months later, plaintiffs complain for the first time that Ms. Harris did not have sufficient knowledge of SunAmerica's contacts with this forum with respect to the following topics: 1) the existence and/or volume of SunAmerica's "dollar roll" and "reverse repo" transactions in Illinois; 2) the volume of SunAmerica's real estate mortgage loans to Illinois entities or on Illinois properties; 3) the existence and/or volume of SunAmerica's secured senior loans in Illinois or with Illinois entities; and 4) the nature of any Illinois real estate holdings of partnerships in which SunAmerica acts as general partner.

Although plaintiffs now complain that they were unable to obtain necessary information from SunAmerica regarding the above subject areas, plaintiffs failed to follow up on the information conveyed by Ms. Harris. For example, at her deposition, Ms. Harris informed plaintiffs where they could obtain requested information regarding SunAmerica's passive investments and corporate financing activities. Ms. Harris testified that the SunAmerica treasury department would be knowledgeable about swap agreements. Harris Dep. Tr. (Ex. F) at 52. She also testified that SunAmerica's investment department would be knowledgeable about commodities trading and "dollar rolls," and that the treasury department would be knowledgeable about "reverse repos." Harris Dep. Tr. (Ex. F) at 58–59. Likewise, in response to plaintiffs' inquiries about SunAmerica's real estate mortgages and secured lending in Illinois, Ms. Harris directed plaintiffs to where they could obtain the requested information, testifying that SunAmerica's mortgage department and department specializing in secured loans would possess the necessary information. Harris Dep. Tr. (Ex. F) at 86, 89.

Despite being provided with this roadmap, plaintiffs apparently did not follow up and obtain the information. No additional 30(b)(6) notice was served and no additional witnesses were requested. Plaintiffs could have come before this court seeking to compel the production of other SunAmerica witnesses with the information they desired, or attempted to obtain the necessary information through utilization of other discovery mechanisms. Despite making numerous (almost weekly) discovery motions, they did not do so. Having inexplicably waited nine months and until after the close of discovery before bringing SunAmerica's alleged discovery deficiencies to the court's attention, plaintiffs should not be heard to complain. Plaintiffs have not demonstrated that a judicial finding or presumption of personal jurisdiction over SunAmerica is appropriate.

### E. *Waiver*

■ Plaintiffs next argue that SunAmerica waived its right to challenge this court's personal jurisdiction over it by failing to timely raise the defense and by participating in the action. The record reveals that SunAmerica participated in a motion to vacate the temporary restraining order filed six days after the complaints were filed. Then, seven days after that, SunAmerica filed a motion to dismiss for lack of personal jurisdiction. Rather than entertain the motion at that time, we expressly deferred consideration of that and other simultaneously filed motions until after completion of discovery by the parties on the pending motions. SunAmerica has done nothing more than comply with the directions of the court. Therefore, contrary to plaintiffs' contention, SunAmerica properly has asserted and preserved its personal jurisdiction defense to this action.

Having participated in the litigation to date pursuant to this court's explicit instruction and without prejudice to its legal rights, SunAmerica has not waived the right to challenge this court's jurisdiction over its person.

### F. *Conclusion*

Plaintiffs have failed to meet their burden of proving that this court has personal jurisdiction over SunAmerica. The complaints

are devoid of any factual allegations purporting to establish SunAmerica's contacts with Illinois or actions connecting it to this lawsuit. Plaintiffs have not established that this court properly can exercise *in personam* jurisdiction over SunAmerica predicated on that section of Illinois' long arm statute granting Illinois courts jurisdiction over claims arising from a non-resident defendant's commission of tortious acts within the state. In addition, Plaintiffs have not demonstrated that their claims against SunAmerica in this action arise from or "lie in the wake" of any transaction of business in Illinois. Moreover, plaintiffs have failed to meet their burden of establishing the existence of extensive, continuous and systematic contacts between SunAmerica and the State of Illinois that are unrelated to Plaintiffs' claims against SunAmerica. Accordingly, consistent with long-established due process principles, it would not be fair, just and reasonable to assert personal jurisdiction over SunAmerica. Therefore, SunAmerica's motion to dismiss for lack of personal jurisdiction is granted, and SunAmerica is dismissed from these actions.

## II. *PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF*

In order to obtain a preliminary injunction, the moving party must demonstrate: 1) some likelihood that it will prevail on the merits of its claim; 2) the absence of an adequate remedy at law; and 3) that it will suffer irreparable harm absent injunctive relief. *Plummer v. American Institute of Certified Public Accountants*, 97 F.3d 220, 229 (7th Cir.1996); *Wisconsin Cent. Ltd. v. Public Service Com'n of Wisconsin*, 95 F.3d 1359, 1366 (7th Cir.1996); *Publications Intern., Ltd. v. Meredith Corp.*, 88 F.3d 473, 478 (7th Cir.1996). Should the movant satisfy these requirements, we must then weigh the portended irreparable harm to the movant against the potential injury to the enjoined party and must consider the effect of the injunction upon nonparties. *Wisconsin Cent.*, 95 F.3d at 1366; *Publications Intern.*, 88 F.3d at 478.

When faced with a preliminary injunction, we are concerned with the equities of maintaining the status quo pending the ultimate determination on the merits. Many cases have held that, even in cases subject to arbitration, a plaintiff is entitled to preliminary injunctive relief to maintain the status quo pending arbitration. *See, e.g., Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1141 (7th Cir.1994); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano*, 999 F.2d 211, 214 (7th Cir.1993); *Sauer–Getriebe KG v. White Hydraulics, Inc.*, 715 F.2d 348 (7th Cir.1983), *cert. denied*, 464 U.S. 1070, 104 S.Ct. 976, 79 L.Ed.2d 214 (1984). In Merrill Lynch, the Seventh Circuit held that "district courts are not precluded as a general matter from issuing preliminary injunctive relief pending arbitration.... [P]ro-arbitration policies ... are furthered, not weakened, by a rule permitting a district court to preserve the meaningfulness of the arbitration by granting injunctive relief." *Merrill Lynch*, 999 F.2d at 214.

### A. *Likelihood of Success on the Merits*

#### 1. *Tortious Interference with Contract and Unfair Competition*

■ In Count I of each of the amended complaints, plaintiffs claim that defendants are engaging in unfair competition by tortiously inducing plaintiffs' former agents to breach their Contracts with plaintiffs. Unfair competition is a general category of torts recognized by courts to protect commercial interests. *Midwest Sports Marketing, Inc. v. Hillerich & Bradsby of Canada, Ltd.*, 552 N.W.2d 254, 267 (Minn.App.1996). Unfair competition can include tortious interference with contract, improper use of trade secrets, and an employee's breach of a duty of loyalty to his or her employer. *Id.*

■ In this case, plaintiffs' Contracts provide, and all parties agree, that Minnesota law governs these claims. Under Minnesota law, the elements of a claim for tortious interference with contract are: 1) the existence of a contract; 2) knowledge of the contract by the alleged wrongdoer; 3) intentional procurement of its breach; 4) no justification for the interference; and 5) damages. *Midwest Sports*, 552 N.W.2d at 267; *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn.1994).

### a. *The Existence of the Contracts*

In this case, we find that the Contracts are valid. Both plaintiffs and the agents obligated themselves to perform many obligations under the Contracts. Plaintiffs incurred expenses in establishing goodwill which plaintiffs allowed the agents to use pursuant to the Contracts. Plaintiffs' established names gave the agents credibility. Moreover, plaintiffs provided extensive training to their agents and provided a substantial customer base to the agents. The agents, in turn, promised not to solicit plaintiffs' clients for one year after leaving the employment of plaintiffs and promised to refrain from using plaintiffs' confidential information. The agents also promised to return plaintiffs' files. Both sides had the right to terminate the Contracts with two weeks notice. Thus, the promises contained in the Contracts were not illusory and an enforceable agreement exists between plaintiffs and their agents.

The next question which arises is whether the restrictive covenants contained in the Contracts are enforceable. Restrictive covenants are, by definition, a partial restraint on trade and thus are disfavored by Minnesota and all other states. They are only enforced if and to the extent that they are reasonably necessary to safeguard a protectable interest of the employer and do not impose unnecessary hardship on the employee's livelihood. *See National Recruiters, Inc. v. Cashman*, 323 N.W.2d 736 (Minn. 1982); *Bennett v. Storz Broadcasting Co.*, 270 Minn. 525, 134 N.W.2d 892 (1965).

In this case, plaintiffs Contracts prohibit the agents, for one-year after leaving the employment of plaintiffs, from soliciting or selling insurance or securities products in the territory where they worked for plaintiffs to the clients disclosed to them while working for plaintiffs. Other covenants in the Contracts prohibit the agents, during and after their affiliation with plaintiffs, from disclosing the identities of plaintiffs' clients and from otherwise misusing confidential and trade secret information obtained through plaintiffs.

Except for the one-year limitation on sales of products to former clients and the restrictions on the use of plaintiffs' confidential and trade secret information, the covenants in the Contracts do not restrict to whom the agents may sell or where, how, or for whom they may work after leaving plaintiffs. Thus, while protecting plaintiffs' reasonable and legitimate interests in its goodwill and trade secrets and in prohibiting unfair competition, the covenants do not deprive the agents of the ability to earn a livelihood by using the skills and the knowledge that plaintiffs provided them.

We believe that under such circumstances, Minnesota courts would uphold the Contracts at issue in this case. The covenants in the Contracts are reasonably necessary to safeguard plaintiffs' protectable interests and do not impose unnecessary hardships on the agents' livelihoods. See *National Recruiters, Inc. v. Cashman*, 323 N.W.2d 736 (Minn. 1982); *Bennett v. Storz Broadcasting Co.*, 270 Minn. 525, 134 N.W.2d 892 (1965). Moreover, in the Northern District of Illinois, temporary restraining orders and a preliminary injunction have been entered upholding and enforcing the same Contracts now at issue. *See, e.g., IDS Financial Services, Inc. v. Smithson*, 843 F.Supp. 415 (N.D.Ill.1994).

Defendants argue that plaintiffs' Contracts are not enforceable under Minnesota law because plaintiffs cannot have a protectable interest in the customers which their agents help develop and which do not have a "near-permanent relationship" with plaintiffs. However, as this Court recognized in *Smithson:*

> Smithson cannot complain that IDS's contract forced him to do what he agreed to do in the contract. The terms of the agreement are clear. That many of Smithson's clients are friends and were acquired by hard work and long hours is of no significance. The hard work and long hours were engaged in for the benefit of IDS and were an essential part of the agreements with IDS. Smithson was aware from his agreement that no matter how he found his clients, he was limited to using IDS's products or services and that the clients would be served only by IDS. If

Smithson did not like the agreement offered by IDS, then he should not have accepted it.

843 F.Supp. at 418–19.

Defendants also argue that because plaintiffs' agents are independent contractors who pay certain of their expenses, the agents cannot be held to the restrictive covenants. There is no dispute that plaintiffs' agents serve plaintiffs as salaried employees during their first year and, after that, become commission-compensated independent contractors. As independent contractors, the agents control and are responsible for certain of the expenses associated with the performance of their jobs. As independent contractors, the agents also set their own hours and choose when and where to conduct business activities. From the fact that plaintiffs' agents are independent contractors who pay certain of their expenses, defendants claim that plaintiffs do not have a serious investment in obtaining the clients that comprise the client base of the agent.

We reject defendants' independent contractor argument. First, the record shows that plaintiffs do have a serious investment in their agents. Plaintiffs spend in excess of $30 million annually on training their agents and provide numerous training opportunities for their agents. Moreover, as Judge Norgle recognized in *Smithson*, plaintiffs pay their agents to develop customers for plaintiffs. If the agents did not like this arrangement, then they should not have accepted it. 843 F.Supp. at 418–19; *see also Matter of Hallahan*, 936 F.2d 1496, 1501 (7th Cir.1991); *Saliterman v. Finney*, 361 N.W.2d 175 (Minn. App.1985).

Defendants next argue that the agents should not be held to the restrictive covenants because numerous agents leave plaintiffs. Defendants offer statistics which show that since 1989 many of the thousands of agents who resigned from plaintiffs went to work for other companies in the insurance or securities industries. Therefore, defendants claim that they cannot be liable for inducing plaintiffs' agents to leave.

That agents leave is beside the point. The relevant issue is not how many agents are leaving, but whether defendants are inducing the agents they hire from plaintiffs to violate the duties these agents owe to plaintiffs. The evidence shows that they are. Thus, it does not matter for present purposes how many agents have left to go to other insurance or securities companies. What matters is the number of plaintiffs' agents whom defendants have induced to violate the agents' obligations to plaintiffs. The evidence indicates that defendants often induce plaintiffs' agents to violate their obligations.

■ Defendants also claim that plaintiffs have not shown a likelihood of success on this issue because they are unlikely to succeed in front of an industry arbitrator. Defendants have collected a binder of 66 cases which have been litigated before the National Association of Securities Dealers ("NASD") and New York Stock Exchange ("NYSE") over the last thirteen years.

First, this argument has no application to two of the defendants, SunAmerica, Inc. and Sun Life, who are not subject to arbitration. In addition, defendants' argument is pure speculation. Indeed, despite defendants claims regarding securities industry arbitrators, in a recent NASD arbitration—pursuant to an award issued on June 19, 1996—an NASD arbitrator granted plaintiffs an injunction against one of their former agents thus enforcing the Contracts. *See Cammick v. IDS Life Ins. Co.*, NASD No. 96–2421 (Ex. 74).

Finally and most importantly, we must enforce the law and uphold valid contracts regardless of what an arbitrator would do. These unreported results, generally without explanation, should not form the precedent on which this Court relies. We should be guided by the legal precedents which are binding on this Court—not by a collection of arbitration awards assembled by defendants, most all of which do not even involve plaintiffs or plaintiffs' Contracts.

For all of these reasons, we find that plaintiffs' Contracts are likely be enforceable.

b. *Defendants' Knowledge of the Contracts*

The evidence shows, and defendants do not contest, that defendants are fully aware of

plaintiffs' standard Contracts with their agents and of the terms of these Contracts. Defendants obtained their familiarity with plaintiffs' Contracts in many ways. First, several of defendants' key executives involved in recruiting plaintiffs' agents used to work as agents and managers for plaintiffs and thus themselves signed plaintiffs' Contracts containing restrictive covenants. In addition, defendants' executives testified during their depositions that defendants have asked for, and been provided with, copies of plaintiffs' Contracts by plaintiffs' agents. The evidence also shows that defendants regularly discussed plaintiffs' Contracts when recruiting plaintiffs' agents. Moreover, plaintiffs' Contracts also have repeatedly been brought to defendants' attention through suits such as *Smithson.*

For these reasons, we find that defendants had knowledge of plaintiffs' Contracts and the terms contained within.

#### c. *Defendants' Intentional Procurement of the Breach and Justification*

The uncontradicted evidence shows that, in order to induce plaintiffs' agents to divert plaintiffs' customers and their accounts away from plaintiffs to defendants, defendants tell plaintiffs' agents that their Contracts are unenforceable. For the same reasons, defendants alternatively tell plaintiffs' agents to violate their Contracts because it is unlikely that plaintiffs will legally pursue them. As such, defendants are inducing plaintiffs' agents to breach their Contracts. *See* Restatement 2d of Torts at sec. 766, comment k; *In re Cutty's–Gurnee, Inc.,* 133 B.R. 934, 966–67 (N.D.Ill.1991).

 Defendants also induce plaintiffs' more successful agents to breach their Contracts by providing attorneys and paying the agents' legal fees if plaintiffs sue them for their wrongful conduct. The uncontradicted evidence shows that defendants have provided their counsel to advise plaintiffs' agents, offered to provide representation should they be sued, and paid for counsel to represent these agents when plaintiffs have sued.

In one instance, defendants agreed to provide its lawyers to represent Jerry Wade, one of plaintiffs' most successful agents who resigned from plaintiffs to join defendants in September, 1994 in case plaintiffs sued him for diverting plaintiffs' customers to defendants. On August 19, 1994, an attorney at Smith, Campbell & Paduano in New York, defendants' regular counsel, wrote Wade to confirm that defendants agreed to provide that law firm and pay the firm's fees and costs in connection with the potential lawsuit that may be filed by IDS in connection with his commencement of employment with Royal. Additional evidence shows that in 1994 and 1995, defendants provided arrangements virtually identical to Wade's to several other of plaintiffs' agents *prior* to the agents' resignation from plaintiffs. *See* Kasanow Dep. Tr. (Ex. 59) at 100–02; Kaizerman Dep. Tr. (Ex. 58) at 135–36, 265; Wells Dep. Tr. (Ex. 65) at 141–44, 268–70; Eilefson Dep. Tr. (Ex 54) at 114–17.

Defendants contend that plaintiffs have not shown a likelihood of success on their tortious inducement claims because plaintiffs cannot show that defendants intended to induce *every* agent they hire to violate their obligations to plaintiffs through these offers of indemnification. Of course, plaintiffs have never alleged, and do not have to show, that defendants expressly intend to induce each and every one of the agents they hire from plaintiffs to violate his or her Contract. For injunctive relief, the issue is future wrongful conduct. Evidence exists that defendants are continuing their actions of inducing plaintiffs' agents to violate their Contracts through these offers of legal representation and payment of legal fees.

Defendants' offers of legal advice and payment of legal fees regarding plaintiffs' Contracts constitute unlawful inducement to breach. *See Bailey v. Meister Brau, Inc.,* 378 F.Supp. 869, 878 (N.D.Ill.1973), *aff'd.,* 535 F.2d 982, 989 (7th Cir.1976); *Edward Vantine Studios, Inc. v. Fraternal Composite Service, Inc.,* 373 N.W.2d 512, 514–15 (Iowa App.Ct.1985). Defendants' agreements regarding legal representation and payment of legal fees were intended to induce the agents to leave plaintiffs and divert plaintiffs' customers.

Defendants also induce plaintiffs' agents to violate their Contracts by directly supporting and facilitating that breach. For example, defendants edit and approve solicitation letters which plaintiffs' former agents send to plaintiffs' customers.[4] Such solicitations are prohibited by plaintiffs' Contracts. In some instances, the letters are approved by defendants while the agents are still working for plaintiffs in order to facilitate the agents' mass solicitation immediately upon their resignations from plaintiffs and before plaintiffs can contact their customers themselves. In some circumstances, defendants even provide the letter to send to plaintiffs' customers. Most agents defendants hire from plaintiffs solicit, within one year of joining defendants, those customers they serviced on behalf of plaintiffs. See Affidavit of B. Guarino (Ex. 11) at para. 2; Kaizerman Dep. Tr. (Ex. 58) at 199; Wells Dep. Tr. (Ex. 65) at 171–72; Eilefson Dep. Tr. (Ex. 54) at 119–20. Such solicitations violate the agents' Contracts with plaintiffs.

Defendants also provide inducements to plaintiffs' agents to violate their Contracts by means of other assistance, including instructions on how to transfer customers and how to obtain bonuses based on how much money they can move from plaintiffs in violation of the agents' Contracts. As such, defendants are inducing plaintiffs' agents to violate their contractual obligations. *See American Republic Ins. Co. v. Union Fidelity Life Ins. Co.*, 470 F.2d 820, 824–26 (9th Cir.1972); *ISC–Bunker Ramo Corp. v. Altech, Inc.*, 765 F.Supp. 1310, 1338 (N.D.Ill.1990).

That defendants' unfair competition is part of their corporate strategy is reflected in the manner in which they compensate those involved in the recruiting of plaintiffs' agents. Defendants have structured compensation systems for their recruiters and agents to provide incentives to these individuals to en-

courage plaintiffs' former agents to switch as much business as they can from plaintiffs in their first year with defendants. Defendants also reward existing agents who refer or recruit other agents from plaintiffs by paying the existing agent 2% of the *first year's* commissions of the new agent. Sinyard Dep. Tr. (Ex. 62) at 65.

For all of these reasons, we find that plaintiffs have proven a likelihood that defendants have intentionally procured plaintiffs' former agents to breach their Contracts with plaintiffs and that defendants actions are not justified.

### d. *Damages*

As a consequence of the unlawful diversions of assets by defendants, plaintiffs have suffered the loss of millions of dollars of insurance policies and mutual fund investments. There is proof that because of defendants' actions, thousands of IDS insurance customers and American Express securities' customers have been diverted from plaintiffs to defendants. In a sampling of the accounts of customers formerly assigned to 72 agents who resigned from plaintiffs to join defendants, in excess of $150 million has been diverted from accounts formerly assigned to these agents in the last two years—with more than $100 million of that amount being transferred in the past year.

As a result of defendants' wrongful conduct, plaintiffs also have suffered the destruction of the valuable long-term customer relationships. Meanwhile, defendants have benefited tremendously by their wrongful conduct through the new customers and new customer assets diverted from plaintiffs to defendants—all at little or no cost to defendants.

On this record, we find that plaintiffs have shown a likelihood of prevailing on Count I

---

**4.** Pursuant to state insurance laws and SEC and NASD rules, defendants are responsible for and must review and approve "mass" mailings by their agents to the public. Indeed, even defendants' procedures manuals require their agents to send solicitation letters to defendants' compliance departments for review and approval before sending them. *See, e.g.,* Ex. 47 (SunAmerica Securities Procedures Manual at 8–2: "Any correspondence directed to 20 or more persons, or

that otherwise falls within the definition of advertising or sales literature, must be submitted to the Compliance Department for review and approval"); *see also Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1574 (9th Cir.1990), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991) (holding that broker-dealer is fully responsible for the acts of its registered representatives, even where the representative is an independent contractor).

for purposes of preliminary injunctive relief. *See Brunswick Corp. v. Jones,* 784 F.2d 271, 275 (7th Cir.1986); *Overholt Crop Ins. Service Co. v. Travis,* 941 F.2d 1361, 1372 (8th Cir.1991).

### 2. Lanham Act Violations

Section 43(a) of the Lanham Act provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

Plaintiffs claim that defendants violated the Lanham Act by encouraging, authorizing or knowingly permitting plaintiffs' former agents to: 1) misappropriate and misuse plaintiffs' trademarks on behalf of defendants (trademark infringement); 2) make misrepresentations regarding plaintiffs' products (false advertising); and 3) misrepresent plaintiffs' endorsement of the agents' activities undertaken on behalf of defendants (false sponsorship).

The gravamen of plaintiffs' Lanham Act claims concerns the alleged mailing of certain solicitation letters to clients by plaintiffs' former agents who are now affiliated with defendants. Plaintiffs claim that agents under defendants control made misrepresentations about plaintiffs' endorsement or sponsorship of these agents and their new products and services in order to induce plaintiffs' customers to terminate their relationships with plaintiffs. Plaintiffs further claim that agents under defendants control solicited for defendants using the letterhead of plaintiffs, claiming that they sell defendants' products while affiliated with plaintiffs.

The evidence shows that some of plaintiffs' former agents who now work under defendants' control have used plaintiffs' letterhead or placed advertisements using plaintiffs' names or marks. The evidence also shows that defendants approved solicitation letters sent by plaintiffs' former agents to plaintiffs' customers making false and disparaging representations about plaintiffs' products and services or misrepresenting defendants agents' relationship with plaintiffs. See Kaizerman Dep. Tr. (Ex. 58) at 180, 235–37; Wells Dep. Tr. (Ex. 65) at 168–71; Eilefson Dep. Tr. (Ex. 54) at 120–21; Sinyard Dep. Tr. (Ex. 62) at 141–42. Many of the solicitation letters approved by defendants purposefully do not disclose that the agents have left the employment of plaintiffs.

Defendants contend that these letters are not likely to confuse their recipients. We find, however, that the letters misrepresent the agents' relationships with plaintiffs and misrepresent plaintiffs' endorsement of the agents' solicitations. Therefore, plaintiffs have shown a likelihood that defendants made false and misleading statements and that such statements were likely to deceive the clients and likely to influence their purchasing decisions.

Defendants also mischaracterize the testimony from the deposition of Steven Smithson. Smithson sent out a letter to IDS clients on December 14, 1993 written on IDS letterhead. Although defendants claim that Smithson remained affiliated with plaintiffs until December 17, 1993, they fail to mention that Smithson at least two weeks earlier had affiliated with defendants. During the two-week period before he tendered his resignation to plaintiffs, Smithson solicited business for defendants using solicitation letters written on plaintiffs' letterhead. As this court held in *Smithson,* Smithson's solicitation letters misled the clients Smithson had been serving into believing that they were still

somehow being served by IDS notwithstanding Smithson's new affiliation with SunAmerica. *See Smithson,* 843 F.Supp. at 419. Defendants' contention that Smithson had a legal license to engage in such activity is insupportable.

■ Finally, defendants argue that plaintiffs have not demonstrated a likelihood of proving their Lanham Act claims because plaintiffs have not shown actual consumer confusion. The Seventh Circuit, however, has specified that the elements necessary to prove a "violation of § 43(a) of the Lanham Act do not include any involving actual injury or actual confusion." *Web Printing Controls Co. v. Oxy–Dry Corp.,* 906 F.2d 1202, 1204 (7th Cir.1990). Instead, actual confusion must only be demonstrated to recover damages for the violation. Id. at 1204–05. In this case, plaintiffs are seeking only injunctive relief under the Lanham Act and thus need not demonstrate actual confusion in order to state a claim. *Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 14–15 (7th Cir.1992).

Accordingly, plaintiffs have established that they have a likelihood of succeeding on the merits of their Lanham Act claims. *See Abbott Laboratories,* 971 F.2d at 14–15; *Web Printing Controls,* 906 F.2d at 1205; *Scotch Whiskey Ass'n v. Barton Distilling Co.,* 489 F.2d 809, 811 (7th Cir.1973).

### 3. *Copyright Act Violations*

■ In order to state a claim for a violation of the Copyright Act, plaintiffs must prove: 1) which specific original works are the subject of the claim; 2) that plaintiffs own the copyrights in issue; 3) that the works in issue have been registered in accordance with the copyright statute; and 4) by what acts and during what time frame defendants have infringed the copyright. *Paragon Services, Inc. v. Hicks,* 843 F.Supp. 1077, 1081 (E.D.Va.1994). In this case, plaintiffs have alleged that defendants knowingly permitted plaintiffs' former agents to retain and make infringing use of plaintiffs' copyrighted computer programs and other copyrighted materials.

Plaintiffs have established a likelihood that they are the legal or beneficial owners of registered copyrights in the computer software. Plaintiffs claim to be the owners of the copyrighted software Desk Top Insight, copyright registration number TXu 682481. American Express is also the exclusive licensee of software that has the copyright registration numbers TX 3228128 and TX 4127678. Thus, for purposes of preliminary injunctive relief, plaintiffs have established elements one through three of the above test.

■ Plaintiffs, however, have failed to meet the fourth prong of the test. Plaintiffs simply have not established with the requisite certainty that defendants have infringed the copyrights at issue. Plaintiffs' evidence of this claim primarily rests upon the deposition testimony of Michael Johnston and Steven Smithson. Johnston's testimony consists solely of one telephone conversation with an unidentified person whom he believed to be a SunAmerica employee who purportedly indicated that unknown former IDS agents were using IDS software. During his deposition, Johnston conceded that all of his knowledge of the alleged misappropriation derived from that unidentified individual:

Q. Did any other individuals, beside the one you spoke with at SunAmerica, who you can't recall his name, indicate to you that, quote, ex-IDS planners are still using the DTI software they received while being associated with [IDS]?

A. No.

Q. So when you say "we were told," you mean you were told by this one person from SunAmerica?

A. That's correct.

Johnston Dep. Tr. (Ex. 57) at 81. Plaintiffs' resort to such inconclusive and unpersuasive testimony is insufficient to establish defendants' violation of the Copyright Act.

Plaintiffs' other evidence similarly demonstrates that their Copyright Act claims against defendants are fatally defective and cannot support the granting of injunctive relief against defendants. For example, although plaintiffs cite to the deposition transcript of Steven Smithson to support their misappropriation contentions, Smithson's ac-

tual testimony reveals that his copy of IDS software was inadvertently removed by him upon picking up his belongings from IDS and was returned to plaintiffs. Smithson Dep. Tr. (Ex. 63) at 127–29. Moreover, it has not been proven whether Smithson ever utilized the software after ending his association with IDS.

Likewise, the depositions of several other agents fail to prove plaintiffs' copyright claims. *See, e.g.,* Muntefering Dep. Tr. (Def. Ex. 9) at 115; Crater Dep. Tr. (Def.Ex. 19) at 150; Wade Dep. Tr. (Def.Ex. 7) at 247–48; Kasanow Dep. Tr. (Def.Ex. 16) at 123–24. During the deposition of Wells, for example, he testified that it took two months for IDS to send someone to take over one of his computers. Wells Dep. Tr. (Ex. 65) at 179–80. When he asked if someone would come for the software on the other computer he was told by an IDS agent "no, don't worry about it … If [IDS] want[s] it they will contact you." *Id.* No one from IDS ever contacted him. In the interim, he did not use any of the software. *Id.* Thus, there is no evidence that any copyrighted materials were ever utilized by agents who joined defendants from plaintiffs.

In sum, plaintiffs cite no evidence establishing that defendants misappropriated their copyrighted computer software or other materials in derogation of the Copyright Act of 1976. There is no evidence of substantial deliberate wrongdoing on the part of defendants. Because plaintiffs cannot demonstrate a likelihood of success on the merits with respect to this claim, plaintiffs fail to satisfy that prong of the injunction test and cannot obtain the injunctive relief requested.

### 4. *Misappropriation of Trade Secrets*

A trade secret is information that "[d]erives independent economic value … from not being generally known … and … [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Uniform Trade Secrets Act ("UTSA") § 1 (1995). Trade secrets are tortiously misappropriated if obtained "by a person who knows or has reason to know that the trade secret was acquired by improper means." *Id.*

In this case, plaintiffs claim that defendants are in possession of plaintiffs' records of customer names, addresses, and investment characteristics and are using that information to solicit and serve plaintiffs customers. We find that plaintiffs' customer lists and files are likely to constitute trade secrets. Plaintiffs have paid their agents millions of dollars to develop plaintiffs' confidential customer information. Plaintiffs derive economic value from the confidential information and plaintiffs have taken reasonable steps to preserve the confidentiality of that information by having all agents sign Contracts requiring the agents to maintain the confidentiality of such information and to return that information upon leaving plaintiffs employment. *See Smithson,* 843 F.Supp. at 418.

Defendants have misappropriated plaintiffs' trade secret information. Defendants have obtained plaintiffs' customer records through the agents they have hired from plaintiffs. *See* Aff. of E. Welsh (Ex. 17) at ¶ 10; Aff. of N. King (Ex. 15) at ¶ 3; Wells Dep. Tr. (Ex. 65) at 174–77; Smithson Dep. Tr. (Ex. 63) at 115–21; Kasanow Dep. Tr. (Ex. 60) at 97; Eilefson Dep. Tr. (Ex. 54) at 121.

Although defendants know that plaintiffs' former agents cannot transfer plaintiffs' customers or accounts to defendants without violating their Contracts with plaintiffs, defendants nevertheless encourage their new agents to move customer assets that they had been working with for plaintiffs in their first year with defendants. Defendants have benefitted as a result.

Defendants argue that the agents help to create the customer information and thus possess some sort of privilege to misappropriate it despite contrary confidentiality provisions in their Contracts with plaintiffs. *See* Contracts at § IV.1(e). Contrary to defendants' claims, the UTSA protects customer information even if compiled by employees or agents. *See Stampede Tool Warehouse, Inc. v. May,* 272 Ill.App.3d 580, 209 Ill.Dec. 281, 284, 289, 651 N.E.2d 209, 212, 217 (1st Dist. 1995), *app. denied,* 163 Ill.2d 589, 212 Ill.Dec. 438, 657 N.E.2d 639 (1995).

Moreover, defendants' argument is not supported by the cases they cite. For example, in *Lincoln Towers Ins. Agency v. Farrell*, 99 Ill.App.3d 353, 54 Ill.Dec. 817, 425 N.E.2d 1034 (1st Dist.1981), the court denied injunctive relief because the employer had not shown that its customer list had been kept sufficiently confidential, not because the employer's salesmen had helped compile the list.

Finally, defendants argue that they cannot be held accountable for misappropriation by their agents. Defendants maintain that they do not control, and have no right to control, agents who engage in conversion of records in connection with their business for defendants. Defendants contend that they should not be liable in any regard for this wrongful conduct. We reject this argument.

■ The UTSA bars both actual misappropriation of trade secrets and use of those trade secrets "by a person who knows or has reason to know that the trade secret was acquired by improper means." *See* UTSA § 1 (1995). Thus, an employer or principal misappropriates trade secrets when it knowingly reaps the advantages of its employees' or agents' conversion of trade secrets from a former employer or principal. *See, e.g., PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1271 (7th Cir.1995); *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521–22 (9th Cir.1993), *cert. dismissed*, 510 U.S. 1033, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994).

On such facts, plaintiffs are likely to prevail on their trade secrets claims regarding customer lists and files. *See MAI Systems*, 991 F.2d at 520–22; *Alexander & Alexander Benefits Services, Inc. v. Benefit Brokers & Consultants, Inc.*, 756 F.Supp. 1408 (D.Or. 1991); *Stampede Tool Warehouse, Inc. v. May*, 272 Ill.App.3d 580, 209 Ill.Dec. 281, 651 N.E.2d 209, 217 (1st Dist.1995). For the reasons stated in the previous section, we find that defendants have not misappropriated plaintiffs' computer software and thus no injunction will issue on misappropriation of plaintiffs' computer software.

### 5. *Intentional Interference with Prospective Business Relations*

■ To prove a cause of action for intentional interference with prospective business relations, plaintiffs must prove that: 1) plaintiffs have a reasonable expectation of entering a valid business relationship; 2) defendants had knowledge of that expectation; 3) defendants purposely interfered and defeated this legitimate expectancy; and 4) defendants' actions caused harm to plaintiffs. *See A–Abart Elec. Supply, Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1404 (7th Cir.1992), *cert. denied*, 506 U.S. 867, 113 S.Ct. 194, 121 L.Ed.2d 137 (1992); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 546–47 (7th Cir.1986); *Anderson v. Vanden Dorpel*, 172 Ill.2d 399, 406, 217 Ill.Dec. 720, 723, 667 N.E.2d 1296, 1299 (1996). Plaintiffs have no cause of action against a bona fide competitor for this tort unless the circumstances indicate unfair competition or an unprivileged interference with prospective advantage.

■ In this case, plaintiffs have a reasonable expectancy of continued business relations with their insurance and securities customers. But for defendants' unlawful actions, plaintiffs would in all probability continue in most of their relationships with their current and preexisting insurance and securities customers. The evidence further reveals that defendants are purposefully and wrongfully interfering with plaintiffs business expectancies. The evidence summarized above shows that defendants have used many improper methods of competition to knowingly defeat the plaintiffs' valid business expectancies and destroy plaintiffs' relationships with their customers. Defendants are supporting, assisting, inducing and benefiting from plaintiffs' former agents efforts to induce plaintiffs' customers to cancel the insurance policies and liquidate the securities they hold through plaintiffs. Such conduct violates these agents' Contracts with plaintiffs.

The ultimate purpose of the defendants' unfair competition is to obtain the business of plaintiffs' customers. By hiring plaintiffs' agents and inducing them to violate their restrictive covenants and engage in other unlawful conduct, defendants benefit from these agents' wrongful transfer of customers and customer assets from plaintiffs to defen-

dants. Accordingly, defendants are tortiously interfering with plaintiffs' prospective business expectancies—the likelihood that they will continue to do business with their existing policyholders and securities customers.

Finally, the evidence shows that defendants' actions in interfering with plaintiffs' prospective business relations has caused harm to plaintiffs. Thousands of plaintiffs' customers have been diverted from plaintiffs to defendants and, as a consequence, plaintiffs have suffered the loss of millions of dollars of insurance policies and mutual fund investments. Moreover, plaintiffs also have suffered the destruction of valuable long-term customer relationships.

Accordingly, plaintiffs have shown a likelihood of success on the merits of Counts V. *See Fishman v. Estate of Wirtz,* 807 F.2d 520, 546 (7th Cir.1986); *Prudential Ins., Co. of America v. Sipula,* 776 F.2d 157, 163 (7th Cir.1985); *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.,* 190 Ill.App.3d 524, 137 Ill.Dec. 409, 413, 546 N.E.2d 33, 37 (2d Dist.1989).

B. *Adequacy of Remedy at Law and Irreparable Harm*

The inadequacy of legal remedies and the threat of irreparable harm are inherent in cases such as these when the destruction of customer goodwill and trade secrets are at issue. *See Duct–O–Wire Co. v. U.S. Crane, Inc.,* 31 F.3d 506, 509 (7th Cir.1994); *Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n of St. Louis,* 35 F.3d 1134, 1140 (7th Cir.1994); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano,* 999 F.2d 211, 215 (7th Cir.1993); *IDS v. Smithson,* 843 F.Supp. at 418; *Medtronic, Inc. v. Gibbons,* 527 F.Supp. 1085, 1091 (D.Minn.1981), *aff'd,* 684 F.2d 565 (8th Cir.1982). Without an injunction preventing defendants from inducing plaintiffs' former, and any soon-to-be-former, agents from engaging in actions in violation of their Contracts and other illegal activity, plaintiffs will continue to be irreparably harmed. Thus, should an injunction not issue and defendants be allowed to continue to engage in their acts of unfair competition, the valuable goodwill plaintiffs created in their customer relations at great expense and the valuable trade secret information developed by plaintiffs will be destroyed.

Moreover, because of the nature of the injury—loss of clients' goodwill and future business—damages will be difficult, if not impossible, to measure fully. It would be difficult to determine what plaintiffs' loss in profits and new business will be if the Contracts are not enforced. No remedy at law will make plaintiffs whole. Defendants already have shown their intent to induce plaintiffs' former agents to violate the agents' obligations. Having shown such propensity, plaintiffs are vulnerable to continued infliction of further irreparable harm by defendants' further inducing the agents to breach their Contracts.

Defendants contend that if plaintiffs want injunctive relief to prevent defendants from inducing each agent they hire from plaintiffs to violate his or her Contracts with plaintiffs, plaintiffs must bring a separate action against defendants and each agent involved. We believe, however, that plaintiffs' consolidated cases are a far more efficient means of addressing defendants' conduct which avoids the necessity of bringing many separate actions in courts all around the country. Indeed, it is precisely because defendants are engaged in repeated, wrongful conduct against plaintiffs that plaintiffs have no adequate legal remedy. *See Iowa Center Associates v. Watson,* 456 F.Supp. 1108, 1113 (N.D.Ill.1978); 11A, C. Wright, A. Miller & M. Kane, *Fed. Practice & Procedures,* § 2944 at 89–90 (1995) ("The legal remedy may be deemed inadequate if ... plaintiff demonstrates that effective legal relief can be secured only by a multiplicity of actions, as, for example, when the injury is of a continuing nature, so that plaintiff would be required to pursue damages each time he was injured, equitable relief will be deemed appropriate"). Indeed, in recruiting plaintiffs' agents, defendants exploit the fact that heretofore plaintiffs have had to bring a multiplicity of actions to enforce their rights. Moreover, defendants tell agents that because so many agents are violating their Contracts, plaintiffs will not be able to pursue all of the violators.

Defendants also argue that injunctive relief is not warranted because no raid occurred on March 1, 1995, as promised by plaintiffs in their initial pleadings. It is true that when these consolidated cases were first commenced, plaintiffs vigorously argued that irreparable harm was about to occur in the form of a raid by defendants on March 1, 1995, after bonuses were paid. The evidence has shown, however, that no such raid occurred on that day and that plaintiffs completely exaggerated this threat in its requests for emergency relief. However, whether defendants induce plaintiffs' agents to leave on one day or individually on several days over the course of several years is irrelevant. While no raid occurred on March 1, 1995, defendants will soon hire another agent from plaintiffs and induce that agent to violate his or her duties to plaintiffs. Each time, plaintiffs are irreparably harmed.

Thus, as shown by the evidence, defendants have engaged, and are continuing to engage, in systematic raiding of plaintiffs for their agents and plaintiffs' customers, customer assets, and trade secrets. Accordingly, because of the nature of defendants' conduct against plaintiffs and plaintiffs' resulting injuries—inducing violations of contract rights, loss of customer goodwill and future business, destruction of customer relationships, and business reputation and trade secrets—damages will be difficult, if not impossible to measure fully, and irreparable injury is presumed. Since plaintiffs initiated this litigation, defendants have induced many more agents hired from plaintiffs to violate their duties to plaintiffs. Having shown such propensity, plaintiffs are vulnerable to continued infliction of further irreparable harm by defendants' conduct. Therefore, a preliminary injunction is appropriate.

## C. *Balance of Harms*

Because the injunction will only prohibit defendants from engaging in illegal conduct in which they have no right to engage, there is no recognizable harm that will be caused to defendants if the injunctions are issued. The injunctive relief will not prohibit defendants from hiring plaintiffs' insurance or securities sales agents. Under plaintiffs' Contracts with their agents, agents are free to leave and work as agents for defendants or any other company upon two weeks' notice. The injunction will prohibit defendants only from unfairly competing with plaintiffs by inducing plaintiffs' agents to destroy plaintiffs' insurance and securities customer goodwill and to misappropriate information obtained while the agents were in confidential relationships with plaintiffs.

If the injunctive relief is not granted, plaintiffs will lose their valuable goodwill and trade secret information. Moreover, plaintiffs would be denied the value of their enforceable Contracts. The balance of the harms thus favors issuance of the injunctions. *See IDS v. Smithson,* 843 F.Supp. at 419.

## D. *Public Interest*

The public has an interest in preventing unfair competition, commercial piracy, misleading solicitations, and in safeguarding the confidentiality of financial records. Consequently, the public's interest has been disserved by defendants' actions. The public has no interest in destroying contracts, rewarding theft, and encouraging unethical business behavior. *See IDS v. Smithson,* 843 F.Supp. at 419; *Superior Consulting Co., Inc. v. Walling,* 851 F.Supp. 839, 848 (E.D.Mich.1994), *appeal dismissed as moot,* 48 F.3d 1219 (6th Cir.1995); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kramer,* 816 F.Supp. 1242, 1248 (N.D.Ohio 1992); *Norand Corp. v. Parkin,* 785 F.Supp. 1353, 1356 (N.D.Iowa 1990).

Defendants' agents are misappropriating plaintiffs' confidential information. Defendants are also causing the customers they divert from plaintiffs to suffer adverse consequences. Defendants' agents induce plaintiffs' customers to cancel their IDS life insurance policies to buy replacement coverage through defendants. In so doing, the customers pay defendants' agent new sales commissions and fees. These customers also may have to pay surrender charges, incur new contestability periods, be subjected to new surrender schedules, and suffer adverse changes in coverage. Likewise, customers who liquidate their American Express securities positions in order to move them from

plaintiffs to defendants also incur potentially adverse capital gains taxes and new commissions or fees which they would not have had to pay had they left their investments with plaintiffs.

While the agents' business may be hurt by their inability to work for customers they serviced while affiliated with plaintiffs, the restriction will last for only one year. The agents are not restricted from earning a living by selling any other financial services to anyone else in any other locations. Although this restriction may be painful to the agents, the harm to them does not outweigh the harm to plaintiffs in terms of lost customer goodwill and business.

Moreover, defendants have not shown that it would be a significant hardship on any customers who are unwilling to stay with plaintiffs to find another agent for the one year of the agents' Contracts. While customers may rely on advice from their brokers and insurance agents, there is no basis to find that these customers would have difficulty finding other agents capable of providing the same services for a one year period.

Defendants also misrepresent the nature of the injunction. Defendants claim that the order will:

enjoin defendants from future competitive activities relating to all of its current and future sales people and customers;

operate to inhibit all other firms and thus adversely impact all present (numbering more than 8,000) and future agents of plaintiffs;

impact hundreds of thousands of customers;

essentially enjoin the operation of the rules of the NYSE and NASD and deprive public customers of their freedom and right to do business with the agent of their choice; and

be a "hands off" order, which will stifle competition.

Defendants' claims are groundless. The requested injunction will stop only defendants' illegal conduct, not fair competition by defendants. The injunction does not apply to others in the insurance or securities industries. There is no basis to assert that the injunctions will impact other firms or limit plaintiffs agents' right to communicate. There similarly is no basis to contend that the injunctions will prevent customers from withdrawing their money and moving it to any of the numerous insurance and financial services providers nationwide. The injunctions will not prevent the agents from communicating with plaintiffs' competitors or from earning a livelihood using the skills plaintiffs provided them.

In fact, the narrowly drafted injunction will primarily affect those few people defendants employ as recruiters, 10–20 people. In addition, it may impact the agents defendants have recently hired and will hire. Defendants have admitted that in the 2½ year period between January 1993 and June 1995 they hired 125 of plaintiffs' agents. Thus, the injunction will impact on the order of 50 to 75 agents a year. This proposed order does not come close to defendants' description of it. The preliminary injunction that we are granting is a narrow injunction keeping defendants from unlawfully inducing plaintiffs' agents to violate the agents' duties to plaintiffs.

For all of these reasons, the public's interest will be served by the granting of preliminary injunctive relief in this case.

## III. *PLAINTIFFS' MOTION IN LIMINE*

Plaintiffs have brought a motion in limine. Plaintiffs argue that defendants did not produce documents they were ordered to produce by Magistrate Judge Guzman. Plaintiffs claim that defendants' failure to produce the missing records is due either to the defendants' destruction of these documents or to defendants' disregard of the court's discovery orders. Plaintiffs ask for presumptions establishing all facts which the missing documents could have shown.

Plaintiffs are asking the court to penalize defendants for alleged non-compliance with discovery requests and orders. However, this type of relief is only available when the fact of non-compliance has been conclusively established. We cannot state that non-compliance has been conclusively established in

this case. Defendants have filed certifications confirming that they have produced all documents which are responsive to plaintiff's discovery requests and Magistrate Guzman's orders. While plaintiffs claim that defendants have previously filed such certifications only to later discover more documents, we cannot conclusively state that defendants are currently failing to comply with discovery orders. Therefore, plaintiffs' motion in limine and request for evidentiary presumptions is denied.

## IV. *DEFENDANTS' MOTION IN LIMINE*

Defendants have filed a motion in limine seeking to exclude certain testimony and to strike plaintiffs' affidavits. For the reasons stated below, we grant in part and deny in part defendants' motion in limine.

Defendants first argue that plaintiffs verified complaints should be stricken because they are improperly verified. Specifically, defendants claim that the person who verified the complaints, Gary Irwin, lacks personal knowledge of any of their allegations and admitted that their key allegation regarding the alleged raid is false. We find that the complaints properly were verified.

Defendants next claim that all affidavits submitted by plaintiffs are defective. First, they claim that none of them is sworn on personal knowledge. Some of the affidavits state that the affiant is knowledgeable, instead of being sworn on personal knowledge. We find this distinction to be so small as to be without merit. *See Pfeil v. Rogers,* 757 F.2d 850, 859 (7th Cir.1985), *cert. denied,* 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986) (a district court should not be unnecessarily hyper-technical and overly harsh on a party who unintentionally fails to make certain that all technical, non-substantive requirements of execution are satisfied).

Second, defendants claim that plaintiffs did not disclose to defendants who the affiants were going to be and improperly withheld them from defendants. We find no evidence to support this claim. Moreover, half of the affidavits offered by plaintiffs were previously provided to defendants, attached to plaintiffs' earlier requests for a temporary restraining order.

Third, defendants claim that plaintiffs' affidavits contain statements which should be stricken as inadmissible hearsay. Many of the statements at issue are admissions by defendants' officers, representatives, agents or co-conspirators and thus are not hearsay under Fed.R.Evid. 801(d)(2). Moreover, evidentiary standards are lessened in the context of a preliminary injunction. Therefore, we reject this argument as well.

Next, defendants claim that we should not consider those portions of plaintiffs' affidavits that consist of conclusory statements and legal arguments. We agree and, therefore, disregard those portions of plaintiffs' affidavits.

Finally, defendants claim that the exhibits attached to plaintiffs' affidavits and in plaintiffs' appendix should be excluded on the grounds of hearsay and because they have not been properly authenticated. However, there are diminished evidentiary standards in the preliminary injunction context. When ruling on plaintiffs preliminary injunction motions, we may consider otherwise inadmissible evidence. *See Univ. of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981); *S.E.C. v. Cherif,* 933 F.2d 403, 412, n. 8 (7th Cir.1991), *cert. denied,* 502 U.S. 1071, 112 S.Ct. 966, 117 L.Ed.2d 131 (1992); *Federal Sav. & Loan Ins. Corp. v. Dixon,* 835 F.2d 554, 558 (5th Cir.1987); *Asseo v. Pan American Grain Co., Inc.,* 805 F.2d 23, 26 (1st Cir.1986).

For these reasons, defendants' motion in limine is granted in part and denied in part.

## ***CONCLUSION***

For the foregoing reasons, the motion of defendant SunAmerica, Inc. to dismiss plaintiffs' complaints for lack of personal jurisdiction is granted, and SunAmerica is dismissed from these actions. The motion in limine of plaintiffs IDS Life Insurance Company and American Express Financial Advisors, Inc. is denied. The motion in limine of defendants SunAmerica, Inc., Royal Alliance Associates, Inc., SunAmerica Securities, Inc., and Sun

Life Insurance Company of America is granted in part and denied in part.

The motion of plaintiffs for preliminary injunctive relief is denied on plaintiffs' copyright claims and is granted in all other respects. Defendants Royal Alliance Associates, Inc., SunAmerica Securities, Inc. and Sun Life Insurance Company of America are enjoined from:

inducing, assisting and/or encouraging plaintiffs' agents and former agents to engage in unlawful insurance practices and otherwise violate their Contracts with plaintiffs;

falsely representing to plaintiffs' agents and former agents that the agents' Contracts with plaintiffs are unenforceable;

permitting or inducing plaintiffs' agents and former agents to make false and misleading descriptions or representations of fact regarding their Contracts and regarding plaintiffs and their products and services;

encouraging or inducing plaintiffs' agents and former agents to misappropriate plaintiffs' trade secret materials;

encouraging or inducing plaintiffs' agents and former agents to make misrepresentations regarding their affiliation with plaintiffs and from misappropriating plaintiffs' name; and

encouraging or inducing plaintiffs' former agents to reveal or disclose confidential information contained in plaintiffs' records, including the names, addresses, or any financial information of any client of plaintiffs.

Defendants are directed to turn over all plaintiffs' trade secret information obtained by them through the plaintiffs' agents and former agents that they have induced to convert plaintiffs' trade secret materials.